RIVER RENDERING COMPANY, Respondent, *v.* PETER BEHR ET AL., Appellants.

### June 17, 1879.

1. The constitutional provision prohibiting the passage of any local or special law granting any special or exclusive right, privilege, or immunity, is not violated by a city ordinance, passed as a sanitary police regulation, granting the exclusive right to remove the carcasses of dead animals from the streets.

2. The municipal authorities have the right to prescribe the terms upon which the streets may be used for the purpose of removing the carcasses of dead animals, and may confine such removal to a single agency, subject to their control.

3. Injunction will lie to restrain the removal of such carcasses in violation of a city ordinance granting the exclusive privilege of removal to another.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

McCOMAS & McKEIGHAN and E. P. MEANY, for appellants: Every statute in derogation of the rights of property, that takes away the estate of a citizen, must be strictly construed. — *Fowler* v. *St. Joseph*, 37 Mo. 228; *St. Louis* v. *Speck*, 4 Mo. App. 252; *United States* v. *Fisher*, 2 Cranch, 386. The title of an act, even before the constitutional and charter provisions hereinafter referred to, should be regarded as furnishing aid in showing what was in the mind of the legislature. — *United States* v. *Palmer*, 3 Wheat. 610; *Garrigus* v. *Commissioners*, 39 Ind. 66. The ordinance is in violation of sect. 53, art. 3, City Charter. — Cooley's Const. Lim. 141–151; *Insurance Co.* v. *Mayor*, 8 N. Y. 253; *Ryerson* v. *Utley*, 16 Mich. 269; *Dorsey's Appeal*, 72 Pa. St. 192; *Hind* v. *Rice*, 10 Bush, 528; *Jones* v. *Thompson*, 12 Bush, 394; *The State* v. *Young*, 47 Ind. 150. And in violation of sect. 53, art. 4, Constitution of 1875. — Meyer's Supp. to Wag. Stats. 24. Municipal by-laws must be in harmony with the general laws of the State and with the provisions of the charter. — Cooley's Const. Lim. 198; *Thompson* v. ———, 10 Ohio St. 688; *Haywood* v. *Mayor, etc.*, 12 Ga. 40; *Burlington* v. *Kellar*, 18 Iowa, 59; *Mayor, etc.* v. *Nichols*, 4 Hill, 209; *The State* v. *Caldwell*, 3 La. An. 435; *City of Canton* v. *Wist*, 9 Ohio St. 439. The construction claimed by the respondent for this ordinance would make it in violation of the Constitution of the United States. — Const. U. S., art. 1, sect. 8; *Railroad · Co.* v. *Husen*, 95 U. S. 465. Exclusive privileges are not to be tolerated. — *Chicago* v. *Rumpff*, 45 Ill. 90; *Norwich*

*Gas-Light Co.* v *Norwich Gas Co.*, 25 Conn. 19 ; *Mayor* v. *Thorn*, 7 Paige, 261. And an ordinance which tends to create a monopoly will not be upheld. — *St. Louis* v. *Weber*, 44 Mo. 547 ; *Gale* v. *Kalamazoo*, 23 Mich. 344. An ordinance which pretends to be a regulation for the health of the city, but which amounts to a prohibition, and is unreasonable, is void. — *Austin* v. *Murray*, 16 Pick. 121 ; *Hayden* v. *Nays*, 5 Conn. 391 ; *Dunham* v. *Trustees, etc.*, 5 Cow. 462.

Wagner, Dyer & Emmons, for respondent : Sanitary powers exist independent of constitutions, and may even infringe upon chartered rights. The power to provide for the safety, well-being, and health of the citizen is inherent, and cannot be abrogated. — *The State* v. *Mathews*, 44 Mo. 523 ; *Blair* v. *Finhand*, 100 Mass. 136 ; *Watertown* v. *Mayo*, 109 Mass. 315 ; *Kincaid's Appeal*, 66 Pa. St. 411 ; *Slaughter-House Cases*, 16 Wall. 36 ; *Thorpe* v. *Railroad Co.*, 27 Vt. 194 ; *The State* v. *Fisher*, 53 Mo. 174.

Lewis, P. J., delivered the opinion of the court.

The petition states that plaintiff is a corporation, engaged in the business of rendering the carcasses of animals not slain for the purpose of human food, and producing soap-grease therefrom and selling the same, etc ; that, on July 7, 1876, the City Council of the City of St. Louis passed an ordinance, No. 10,062, which is set out at length in the petition. Its material provisions are as follows : —

" Sect. 1. It shall be the exclusive privilege and duty of the River Rendering Company of St. Louis, for a period of eight years from and after the passage of this ordinance, to remove out of the city and beyond the jurisdiction of the Board of Health, as now or as may be hereafter established, the remains and carcasses of every dead horse, mare, mule, ox, steer, cow, ass, hog, goat, dog, or other animals, within ten hours after a report shall be made to the said River Rendering Company by the chief of police, or any author-

ized agent of the Board of Health, and appropriate them to their own use, observing every care and using the utmost precaution that the carcasses of said animals be conveyed away in the most inoffensive manner possible, causing them to be covered with tarpaulins or otherwise. The drivers of the teams conveying said carcasses shall not stop on the way, unless detained by some unforeseen accident, under a penalty of not less than five nor more than twenty-five dollars for each offence, which fine shall, upon the conviction of any driver or drivers of such teams, be recovered and enforced as other fines before the police justice.

" Sect. 2. The River Rendering Company shall cause to be removed and placed upon a receiving boat or boats of suitable size, strength, and dimensions all carcasses and remains of dead animals mentioned in sect. 1 of this ordinance, within six hours after a report shall be made to said River Rendering Company in conformity with the provisions of said sect. 1 ; and no rendering or manufacturing upon such receiving boat or boats shall be done inside the city limits, and only in such manner and in such place as may be designated by the Board of Health, and so that no nuisance may be created thereby ; provided, however, that during the winter months, when the river is blocked with ice, such steam rendering or manufacturing may be done in such manner, in such place, and at such hours as may be designated by the Board of Health.

" Sect. 3. The River Rendering Company shall, before being authorized to perform the duties and enjoy the privileges granted by this ordinance, execute to the city of St. Louis a bond, with good and sufficient securities, in the sum of five thousand dollars, to be approved of by the mayor and filed and preserved in the office of the city register, conditioned for the faithful and punctual performance of the duties imposed by the provisions of this ordinance.

" Sect. 4. It shall be the duty of the police department to notify the River Rendering Company, their officers or

agents, of the whereabouts of every animal carcass which they may find, or of the existence of which within the city limits they may be informed, as soon as possible ; and within six hours of their being so notified, it shall be the duty of said River Rendering Company to remove the same in the manner specified in sect. 1 of this ordinance ; and upon the failure of said company to so remove the carcass of any dead animal within the time so specified, the manager or chief officer thereof shall be subject to a fine of ten dollars for the first offence, and for every subsequent offence twenty dollars, to be recovered as other fines before the police justice.

" Sect. 5. The River Rendering Company, or any person, copartnership of persons, or corporation who shall remove the carcass or carcasses of any dead animal or animals not slain for the purposes of human food, shall give a bond of five thousand dollars as a guaranty that none of the product of any carcass specified in sect. 1 of this ordinance shall be employed or utilized for purposes of human food, and that all grease and other products rendered or manufactured, or packed for use or transportation to or from market in the city of St. Louis or elsewhere, shall be branded with a burning-brand as follows : ' Product of dead animals, St. Louis.'

" Sect. 6. Hereafter it shall not be lawful for any person, copartnership of persons, or corporation, except the River Rendering Company, to remove the carcasses of any dead animals as specified in this ordinance, without first having obtained a permit so to do from the clerk of the Board of Health, said permit specifying the date when and the person to whom issued, the kind of animal or carcass to be removed, the place to and from which the same is to be taken, and the character of the products to be derived from the same."

The petition further sets forth that plaintiff accepted the provisions of the ordinance and gave bond in due form as therein required, and has procured at great expense receiv-

ing-boats and all the necessary machinery, implements, and appliances for the successful operation of its business, and is now engaged with a sufficient force of employees in carrying on the same; that plaintiff would, but for the wrongful acts of defendants as hereinafter stated, have made great gains, advantages, and profits by virtue of the privileges, powers, and duties provided for in said ordinance; that plaintiff has in all things faithfully complied with the terms of said ordinance, and is therefore entitled to the exclusive privilege, for the period of eight years from and after its passage, of removing out of the city of St. Louis and beyond the jurisdiction of the Board of Health the carcasses and remains, etc., as described in the ordinance; that defendants have, in violation of the provisions of the ordinance and of the plaintiff's rights in the premises, been removing the carcasses, remains, etc., as described, out of the city of St. Louis and beyond the jurisdiction of the Board of Health, and threaten and intend to continue so doing, to the great detriment and irreparable damage of plaintiff; that defendants are insolvent, and unable to respond in damages. Plaintiff prays that the defendants be perpetually enjoined and restrained from further removing or attempting to remove such carcasses, remains, etc.

The answer avers that the defendants have a factory situated in St. Clair County, Illinois, and are there engaged in the business of rendering the carcasses of dead animals into grease, bone-black, and fertilizer; that they purchase such animals at the stock-yards, and do not purchase, remove, or interfere with animals that die in the city of St. Louis and are abandoned by their owners, and which are liable or likely to become a nuisance, and which are under the jurisdiction and control of the Board of Health, but they only purchase such animals as are shipped by railroads and boats into the stock-yards, and which are claimed and possessed by their owners and are not abandoned; that defendants only claim the right to purchase the same from

the owners thereof, in the open market, and to remove them immediately to their factory so that they cannot possibly become a nuisance. The defendants made ·a good and sufficient bond, in pursuance of sect. 5 of said ordinance, and presented their petition to the Board of Health for a permit, as provided for in sect. 6 ; but said board, and the clerk thereof, refused to issue a permit to defendants on any terms. Defendants deny that they are in any manner interfering with the plaintiff in the pursuit of its lawful occupation, and aver that the city of St. Louis has no power to confer an exclusive privilege to remove or to appropriate the carcasses of dead animals, as claimed by the plaintiff.

The cause was finally submitted on the petition and answer, it being agreed that the pleadings were true as to the facts stated. The court decreed a perpetual injunction as prayed for in the petition.

Defendants make a point on the supposed invalidity of the city ordinance in question, because of its non-conformity with art. 3, sect. 13, of the present city charter, which provides that "no bill * * * shall contain more than one subject," etc. The ordinance was passed in July, 1876, before the adoption of the present charter. The charter then in force contained no such provision as the one referred to.

The defence chiefly relied on is that the ordinance is in violation of art. 4, sect. 53, of the State Constitution, which provides that "the General Assembly shall not pass any local or special law granting to any corporation, association, or individual any special or exclusive right, privilege, or immunity." Plaintiff, on the other hand, sustains the ordinance, on the ground that it is a proper exercise of the police authority of the municipal government for the preservation of the public health and comfort, and therefore not within the meaning of the constitutional prohibition. It is needless to discuss the question whether a restriction laid upon the General Assembly will apply

equally to the municipal legislature. So far as such restriction may affect the rights of persons, there can be no possible difference, since all municipal legislation must be not inconsistent with the Constitution and laws of the State. The constitutional rights or disabilities of citizens must be the same everywhere. The principal question will therefore be treated as if the constitutional prohibition were specially directed against the city authorities.

In *The State* v. *Fisher*, 52 Mo. 174, our Supreme Court had occasion to consider the effect of "An act to preserve the health of the inhabitants of St. Louis County by providing for the abatement of nuisances and regulating the traffic in the carcasses of dead animals," passed in 1872. The general operation of the act was to prevent any person from purchasing any carcass or remains of dead animals, and from rendering, boiling, or steaming the same for purposes other than for food, unless he should be the owner of such carcass or remains, or unless he should have a special license or authority from the city of St. Louis to render, boil, or steam, etc., at a place to be designated by ordinance. In pursuance of authority conferred by the act, a city ordinance was passed giving to certain persons an exclusive privilege of removing dead animals, and allowing them to render, boil, and steam the carcasses on boats outside of the city. The ordinance required a bond from the privileged parties, and prohibited all other persons from in any manner removing or interfering with such carcasses, or using the same, except as provided for in the ordinance.

The act was sustained by the court as a proper police regulation for the purpose of preserving the public health. Nothing was said about the influence of a special constitutional provision against exclusive privileges, because the Constitution of 1865, under which the case arose, contained no such provision. The court said, however, that " a law which unnecessarily and oppressively restrains a citizen from engaging in any traffic, or disposing of his property as he

may see fit, although passed under the specious pretext of a preservation of the health of the inhabitants, would be void. Such a law would be unreasonable, and would deprive the people of the rights guaranteed to them by the organic law of the land. But if the regulation or prohibition contains nothing more than the necessary limitations, and is passed in good faith for the purpose of preserving the public health and abating nuisances, it is not liable to objection."

In the police power of a State lies the most comprehensive expression of the beneficent purposes for which all governments are created. It "extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State." In its relations with the enjoyment of property, it is based upon the settled principle "growing," as was said by Chief Justice Shaw, "out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." In judicial annals, the objections urged against the exercise of this power are usually found to rest upon some supposed overstepping of the constitutional limits of legislative authority. Hence, when the police power is sustained by the courts, the impression not unfrequently arises that it asserts an authority above the Constitution. But when rightly understood, it appears rather as an interpretation of the true meaning and spirit of the organic law in its application to subjects not therein specifically defined. Thus, it was said in *The People* v. *Jackson, etc. Co.,* 9 Mich. 307, that police regulations, "which would otherwise be clearly prohibited by the Constitution, can be such only as are so clearly necessary to the safety, comfort, and well-being of society, or so imperatively required by the public necessity, as to lead to the rational and satisfactory

conclusion that the framers of the Constitution could not, as men of ordinary prudence and foresight, have intended to prohibit their exercise in the particular case, notwithstanding the language of the prohibition would otherwise include it." Whenever such an apparent conflict is judicially determined upon this basis, it will be found, we think, that the subject-matter deals with abstract or implied rights, rather than with such as are protected or secured by the Constitution in express terms. For example, a railroad company is incorporated under circumstances which make the charter, in all its terms, a binding contract with the State. There is no provision requiring the railway to be fenced. Afterwards a law is passed requiring that all railways be fenced, for the protection of passengers and property. If the law be opposed by the corporation, it is on the ground that inasmuch as the charter authorizes the running of the road without any condition imposed on the subject of fencing, it is implied therein that the right so to operate without fencing shall be perpetual. This implied right must therefore be protected by the constitutional inhibition against impairing the obligation of contracts. In such cases the courts uniformly hold that the police regulation must prevail. But suppose the Constitution should declare, in so many words, that the legislature should not have power to pass any law requiring the fencing of any railroad. It is not to be supposed, in that case, that a law passed in violation of the direct constitutional provision would be judicially sustained. Thus, while the right to enjoy property according to the pleasure of the owner, however broadly guaranteed by implication in the organic law, is always subject to the precept, *Sic utere tuo ut alienum non lœdas*, yet when a specific method is proposed for enforcing this precept which the Constitution has expressly forbidden, there is no room for speculation as to what the framers must have intended. The denial of the method shows that their attention was directed to that subject, and that what they meant must be

gathered strictly from the words employed. An application of these principles to the ordinance under consideration, in view of the prohibition against exclusive privileges, may seem to deny its validity.

But there is another point of view from which the subject must be considered. When different ways are open for the exercise of a certain power, one must not be chosen, if it can be avoided, which will necessarily violate a guaranteed right. But if, in the exercise of an undoubted power by the only possible means existing, an injury incidentally ensue, this furnishes no sufficient reason against the exercise of the power. It sometimes occurs, from the necessity of the case, that the party intrusted with the exercise of a power must be the exclusive judge of the means necessary for that purpose. It would not do, for instance, that quarantine regulations during the prevalence of an epidemic should be abolished on the ground that a better locality might have been selected by the health department. In such cases, it is better that a possible departure from the line of excellence shall interfere incidentally with the comfort, or even with the property rights, of a few, than that the whole community shall be deprived of measures essential to the preservation of the public health.

Again, in States where the granting of exclusive privileges was as emphatically forbidden, in general terms, as now in Missouri, it has always been considered that the legislative authority might nevertheless confer an exclusive right to maintain a ferry or to erect a toll-bridge within certain territorial limits. This is because to the legislature belongs the especial control of the highways, with the power and duty of facilitating the public use of them for travel and traffic. In the exercise of this power it may select its agencies, and in so doing must determine whether it be practically possible for the agent to maintain the ferry or erect the bridge in the face of an unrestrained competition. In short, if it finds that the exclusive right is absolutely

necessary to the execution of the power, it must not be deterred by the incidental circumstance that some other individual may be deprived of the privilege of filling the same public agency.

The municipal legislature is especially charged with the preservation of the public health. That high duty lies in prevention rather than in cure. It would be poorly discharged, or not discharged at all, if the surest and most well-known precautionary measures were not thoroughly put in practice against the introduction of disease. In a populous city, where large numbers of animals die every day, it is of the first importance that their carcasses be speedily removed from the centres of human habitation. The city authorities would be grossly derelict if they left the chances of removal to be determined by the owners of the animals or by the enterprise of possible purchasers. They are in duty bound to appoint special agencies for the purpose, and to render performance certain by whatever means their best judgment may suggest. If they find that this certainty can be secured only by confining the agency to a single person or corporation, upon terms of responsibility for a failure to perform, it is their duty and their privilege to so secure it. The agency so appointed is rather the instrument in the hands of the municipal authorities for the fulfilment of a public duty, than the beneficiary of an exclusive privilege.

It must be observed that in the ordinance under consideration the only words which exclude persons or corporations other than the plaintiff apply, not to the business of rendering, boiling, etc., but only to the removing of the carcasses. This mere removal of offensive matter, or of matter likely to become offensive, pertains strictly to the municipal police authority. It is not properly a calling open to all, any more than the inspection of sewers or the guarding of the public streets. It would be more beneficial, doubtless, to persons engaged in the business of ren-

dering and boiling, etc., if the right of removal were free to all. But the same may be said of privileges denied to other callings which derive no advantage from the necessary monopolies of official ministrations.

There is yet another ground upon which the ordinance may be sustained. The municipal authorities have entire control of the public streets, and of the terms upon which they may be used for specified purposes. On this doctrine rests the right, so often recognized, to tax and license vehicles of different descriptions.

For the removal of carcasses to a place without the city, the streets must be used. The city authorities may prescribe the terms upon which the streets may be used for that purpose, by license or otherwise; and, inasmuch as the public health and comfort may be more or less affected by the manner and time of the transportation, they have an unquestionable police power to confine the transportation to a single agency, which they can at all times control in the most effectual way for the health and comfort of the community.

The burden of showing that a power conferred on the municipal government for beneficial purposes has been oppressively used as a mere pretext for granting an unlawful exclusive privilege, rests upon him who makes the charge. No such showing is here made with reference to the ordinance under consideration. We must consider it as fairly and wisely adopted by the municipal legislature as the best and only available means of protecting the community against a prolific cause of annoyance, discomfort, and disease. The judgment of the Circuit Court was free from error, and will be affirmed. All the judges concur.