[No. 8810.   Department Two.   May 28, 1910.]

THE CITY OF SEATTLE, *Respondent*, v. JOHN P. DENCKER, *Appellant*.[1]

CONSTITUTIONAL LAW—CLASS LEGISLATION —LICENSES —OCCUPATION TAX—DISCRIMINATION. A city ordinance providing a license tax upon the sale of goods of any kind by means of any automatic device violates the constitutional prohibition against granting to any citizens special privileges and immunities which upon the same terms do not equally belong to all citizens; since it discriminates against a simple mode of doing business which is conceded to be lawful and fair, and in no way involves the police power.

Appeal from a judgment of the superior court for King county, Ronald, J., entered March 28, 1910, upon a trial and conviction of the violation of an ordinance relating to the sale of goods by automatic vending machines. Reversed.

*Lyter & Folsom* and *I. L. Blair*, for appellant.

*Scott Calhoun* and *Ralph S. Pierce*, for respondent.

DUNBAR, J.—This is an appeal from a judgment of the superior court for King county, after trial upon conviction of the violation of an ordinance of the city of Seattle relating to the sale of goods by automatic vending machine, which ordinance reads as follows:

"An Ordinance licensing certain automatic devices, and providing a penalty for violation.

"Be it ordained by the city of Seattle as follows:

"Section (1)   That it shall be unlawful for any person to maintain, keep, conduct, manage, have in his possession or control for use, any automatic device for the sale of goods of any kind or character, where money or any repre-

[1]Reported in 108 Pac. 1086.

sentative of value is used to operate the same, or where gain or trade is the object, without being licensed so to do by the city of Seattle.

"Section (2)   The license required by this ordinance shall be secured by paying the required amount to the city treasurer, receiving a receipt therefor and presenting such receipt to the city comptroller, who shall issue such license as the receipt calls for.

"Section (3)   The schedule of amounts to be paid for licenses, is as follows:   Where a deposit of one (1) cent or slug representing the same in trade, is required to operate the same, one (1) dollar per year for each device; where a deposit of five (5) cents or slug representing the same in trade, is required to operate the same, five (5) dollars per year for each device; where a deposit of ten (10) cents or slug representing the same in trade, is required to operate the same, ten (10) dollars per year for each device; where a deposit of twenty-five (25) cents or slug representing the same in trade, is required to operate the same, fifteen (15) dollars per year for each device.

"Section (4)   The provisions of this ordinance shall not be held to include or apply to the sale of gas, or other commodities, through prepayment meters, or the installation and use of telephones with slot machine devices, by public service corporations, operating under franchises granted by the city of Seattle, or to the sale of candies or similar confections, by automatic devices in theaters or other such places of public assembly where a fee is charged for admission."

Defendant is the manager of the Northwestern Automatic Vending Machine Company, a Washington corporation, which is engaged in the business of selling cigars at retail by means of vending machines; owns and operates a great many of these machines in the city of Seattle, and has invested a large sum of money in said machines.   The machines are placed in hotels where cigars are required by the patrons, are under the general supervision of the clerks of the hotel, and as a rule, a certain percentage is given to the hotel men for operating the machines.   Under the ordinance in question, the license fee required for the operation of the machines varies from $30 to $95, according to the number of

devices, the fee being based on the denomination of the coin required for operation and the number of devices, and not on the amount of business done. Each machine has a device for five, ten, and twenty-five cent pieces. The cigars are at all times exposed to view under their proper labels and prices, so that the purchaser can at all times see what he is getting for his money, and he gets just what he pays for. If he drops in a five-cent coin in the device calling for a coin of that denomination, and presses the plunger, he gets a five-cent cigar; if a ten-cent coin, a ten-cent cigar; and if a twenty-five-cent coin, either a two-for-a-quarter or a three-for-a-quarter cigar, according to his selection. There is no more opportunity for the customer being cheated or defrauded in dealing with this device than by any other one.

The question for determination here is the validity of the ordinance. It is conceded that this ordinance is a revenue measure; that the only ground of difference between licensed and unlicensed sales in this ordinance is in the mode of sales, whether by device or hand. It is conceded that none of the other retail merchants of that occupation are taxed by licenses for the sale of cigars; that if the sale is by this device the license is imposed, and that if it is by hand, in the ordinary way, no license is required.

In the discussion of this question there are certain fundamental principles which may be conceded, viz: That it is a well-known attribute of sovereignty to tax occupations for the purpose of raising revenue, and that such tax may be imposed in the form of a license fee; that the state may tax all or any occupations or business carried on within its boundaries, imposing the burden upon some and passing by others; that only considerations of general policy determine such selections, and that there is no restriction unless it be imposed by the constitution. This determination, however, must not be exercised arbitrarily or fraudulently, and while the policy of the enactment may not be questioned by the courts, the discretion exercised by the law-making power

must be natural and reasonable, and consistent with the general principles of law and the fundamental principles upon which our government is founded. When these principles are violated to the extent of depriving the citizen of natural or constitutional rights, it is the duty of the court to intervene in his behalf. A wilderness of authority might be cited on this interesting and fruitful subject of litigation; for, from the beginning of not only our government but of all government, the contest has been waged between legislative powers and individual rights. But from the best considered cases, the general principles above announced can be deduced.

Tested by these principles, can this ordinance be sustained? We think not. It is plain that there is no police power or regulation involved, a power which is the sustaining principle in ninety-nine out of a hundred of the cases cited; for there is no claim that the business discriminated against here affects in any way the public morals or the business interests of the community, except as it affects the interest of others engaged in the same business but purely in the way of competition. The article that is sold does not in any way involve the police power. Hence, it is a matter of no public concern whether it be sold by device or by some other method. And here it is well to note a vital distinction, founded on sound and just principles of law, between the power to tax occupations under the form of a license which, by reason of the character of the occupation, is subject to police regulation, and the power to tax what are termed useful trades and employments, under the guise of a license. It is well settled that the license required of employments of the latter character can carry with it only such fee as is necessary to make compensation for the regulation services, and cannot be perverted into a tax. Especially is this true when the attempt is made to discriminate between occupations alike in principle but differing only in mode of operation in some trifling particular.

The respondent relies largely upon the case of *St. John v. New York*, 201 U. S. 633, where the supreme court of the United States sustained an act prohibiting the sale of adulterated milk, where in certain respects it provided different prohibitions and penalties as to producing and non-producing vendors of milk, the enactment making it a penal offense for a person to vend milk that contained more than a certain amount of water and less than a certain amount of milk solids. The objection urged to the law was that it was a discrimination between the vendor and the producers of the milk, and that such discrimination had no basis in right or public policy. In discussing the case, the court said:

"It has been decided many times that a state may classify persons and objects for the purpose of legislation. We will assume the cases are known and proceed immediately to consider whether the classification of the law is based on proper and justifiable distinctions, considering the purpose of the law and the means to be observed to effect that purpose. By referring to section 20 it will be observed that adulterated milk, as there defined, includes not only that to which something has been added, but milk from which the cream has been removed, or which is deficient naturally in certain substances, or taken from cows fed on certain things, or cows in certain conditions when milked. In other words, the purpose of the law is to secure to the population, adult and infant, milk attaining a certain standard of purity and strength. All other milk is declared to be 'unclean, impure, unhealthy, adulterated, or unwholesome.' It is not contended that such purpose is not within the power of the state but, it is contended, that the power is not exercised on all alike who stand in the same relation to the purpose. . . . legislation to be practical and efficient must regard this special purpose as well as the ultimate purpose. The ultimate purpose is that wholesome milk shall reach the consumer, and it is the conception of the law that milk below a certain strength is not wholesome, but a difference is made between milk naturally deficient and milk made so by dilution. It is not for us to say that this is not a proper difference, and regarding it the law fixes its standard by milk in the condi-

tion that it comes from the herd. It is certain that if milk starts pure from the producer it will reach the consumer pure, if not tampered with on the way. To prevent such tampering the law is framed and its penalties adjusted. As the standard established can be proved in the hands of a producing vendor, he is exempt from the penalty; as it cannot certainly be proved in the hands of other vendors so as to prevent evasions of the law, such vendors are not exempt."

It would be difficult to discover in principle any similarity between that case and the one at bar. The court in that case, as in nearly all the cases, starts out with the discussion as to what is the purpose of the law. The purpose of the law in the case just cited was to prevent the adulteration of milk, which the state undoubtedly had a right to do under its plain police powers, for the protection of the health of the citizen. But as we have before said, this case is stripped of any police feature, and if we were to start an investigation to determine the purpose of this act, it could only end in a report that there was no such beneficent purpose as was stated by the court in that case, but that the purpose, if it had any, was to benefit the regular retail cigar merchants by suppressing a business of the same kind, but differing simply in the mode of the delivery of the cigars; or in other words, to prevent honest competition in the cigar trade. The further reason upon which the court decided that case, viz., that it was more difficult to detect fraud when the milk was in the hands of the vendor than when it was in the hands of the original producer, is also absent in this case. As the testimony shows, and as the model of the machine indicates, there is no more opportunity for fraud or deceit in selling cigars under this system than in selling them in any other way.

The case of *Chicago v. Bowman Dairy Co.*, 234 Ill. 294, 84 N. E. 913, 123 Am. St. 100, 17 L. R. A. (N. S.) 684, also largely relied upon by the respondent, is practically the same kind of a case. Probably the circumstances of that

case bring it a little nearer to the case at bar. There an act was sustained which required dealers, selling cream and milk in bottles or glass jars, to have the capacity of the bottles or jars permanently indicated upon them; and prescribed a penalty for having in their possession bottles or glass jars of capacity less than that indicated on the outside; while the act did not apply to vendors of milk through other agencies. But that case, as the other, was sustained on the doctrine of the police power of the state. Even so, we are doubtful if that case could be indorsed by this court under the decision in *Spokane v. Macho*, 51 Wash. 322, 98 Pac. 755, 21 L. R. A. (N. S.) 263, where it was held that, in an ordinance to regulate and license employment agencies, a section making it a misdemeanor for the keeper of an employment agency to make wilful misrepresentations or to wilfully deceive any person seeking employment, and take a fee for such employment, is unconstitutional, since it is not general and impartial in its operation, but operates upon one class to the exclusion of others in respect to a penal act common to all classes of business, and exceeds the reasonable limit of police regulations. In that case it was stated that it is a fundamental proposition that an ordinance must be fair in its terms, impartial in its provisions, and general in its application; citing Dillon, Mun. Corp. 322, and McQuillan, Mun. Corp. 193. It was also said:

"When exercising its power to regulate a business, the municipality may classify subjects of legislation, but the law must treat alike all of a class to which it applies, and must bring within its classification all who are similarly situated or under the same condition"; citing *State v. Sheriff of Ramsey County*, 48 Minn. 236, 51 N. W. 112, 31 Am. St. 650, where the court said:

"The classification must be based on some reason suggested by a difference in the situation and circumstances of the subjects treated, and no arbitrary distinction between different kinds or classes of business can be sustained, the conditions being otherwise similar."

A much worse discrimination would be a discrimination between citizens of the same class engaged in the same business, where there is no reason suggested by a difference in the situation and circumstances of the subjects treated; for not only is the business in this case similar and identical, but it is purely and simply a difference in the mode of transacting the business, a mode which cannot possibly affect any principle or affect deleteriously the consumer or purchaser of the article sold. The general principle announced by Mr. Dillon in his work on Corporations, vol. 1, § 322, seems to be specially applicable here:

"As it would be unreasonable and unjust to make, under the same circumstances, an act done by one person penal, and if done by another not so, ordinances which have this effect cannot be sustained. *Special and unwarranted discrimination,* or unjust or oppressive interference in particular cases, is not to be allowed. The powers vested in municipal corporations should, as far as practicable, be exercised by ordinances general in their nature and impartial in their operation."

The Montana legislature passed a law imposing a license tax of $25 per quarter on every laundry business other than that of a steam laundry wherein more than one person was employed or engaged, and but $15 per quarter upon steam laundries. This law was sustained by the state court of Montana, but was afterwards declared unconstitutional by that eminent jurist, Judge Knowles, of the United States circuit court, in *In re Yot Sang,* 75 Fed. 983. In the course of the opinion it was said:

"Unless there is something so different in the conducting of a laundry by steam to that of the carrying on of that business by any other means, the law providing a different and more excessive license for the conducting of such business other than by steam is unequal and unjust. . . . It may be said that the state may have wished to encourage steam laundries. If so, it had no right to do it at the expense of any person carrying on such business other than by means of steam. Such an argument would imply that it

was in the power of a state to force a man who conducted a business in one mode to abandon the same in order that he who conducted such business in another mode should be encouraged and built up."

The court concluded that, where the same business is conducted by different modes, it was unjust and in violation of the rule that each man should have the protection of equal laws, to place upon one a greater burden than upon the other. It is stated by counsel for appellant, as a matter of history, that, since the determination of this case in the United States court, it has been accepted as the law of the state, and that there have been no prosecutions under the statute. However this may be, we are satisfied that the decision of the United States court expresses the true principles governing such cases.

In the case of *Covington v. Dalheim*, 126 Ky. 26, 102 S. W. 829, the court, in passing upon the constitutionality of an act which imposes a tax on a certain class of grocers without the imposition of the same tax on others, held that the tax must apply to all grocers in the city, and that the act was unconstitutional, saying:.

"It is competent for the city to select any of the enumerated classes as subjects for license taxes. But it is not competent for it to tax some members of a class set apart by the legislature and not tax others of the same class."

And the principle announced in that case was reaffirmed by the court of appeals of Kentucky in the case of *Read v. Graham*, 31 Ky. Law 569, 102 S. W. 860. These last three cases which we have mentioned seem to be exactly in point on the question under discussion.

It is very well suggested by counsel for appellant that it would be just as reasonable to discriminate against a merchant who used a patent carrier for the transmission of money and change, instead of a cash boy. The same rule might apply to a thousand different improvements that have a tendency to cheapen products by reason of the fact that

they are labor saving machines, and do away with the necessity for so many clerks and employees. It is a legitimate business, and it makes no difference to the public whether the cigar is delivered by means of this automatic device or in the ordinary way. A strict or puritanical conception of the business of selling cigars might be that it was harmful to the health of the consumers, but the mode of selling them would not enter into that thought. Nor can the objection that it is particularly attractive be urged, for handsome girls are ordinarily employed around hotels for the purpose of selling cigars, and no doubt many susceptible men are induced to buy more cigars than they otherwise would by reason of the employment of this delivery agency.

Fairly considered, this seems to be a tax on invention, for invention in most cases, as in this, lessens the expense of the business, and thereby necessarily cheapens the product. This was one of the arguments advanced in favor of sustaining the validity of this ordinance, viz., that the machine could be manufactured and operated for less money than a retail cigar store could be equipped and operated. It would seem that the reduction in price of an article of commerce would savor of the quality of a blessing rather than of a curse, when the welfare of the consumer is taken into consideration; and to hold otherwise would reverse the general rule that legal restraints may be imposed upon the few for the benefit of the many. The tendency of this kind of an income is to foster monopolies, for a monopoly exists when the manufacture and sale of any commodity is restrained to one or a certain number. It is said that it has three inseparable consequences—the increase of the price, the badness of the wares, the impoverishment of others. Hence, it naturally follows that monopolies are odious to the law, and the law will concern itself to restrain rather than to nourish them. If this ordinance can be sustained, there is no limit to the arbitrary, capricious, or tyrannical imposition of taxes, and the constitutional guaranty that "no law shall

be passed granting to any citizen, class of citizens or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations," becomes a dead letter. Discrimination to the extent exhibited in this ordinance discourages enterprise, paralyzes progress, is a deprivation of liberty, and is entirely inconsistent with the true principles and the genius of our government. None of the cases cited, from either this or any other court, numerous as they are, go to the extent of discriminating against a simple mode of doing business, which is conceded to be lawful and fair, and which in no way involves the principles of police power or regulation.

The judgment will be reversed, with instructions to dismiss the action.

RUDKIN, C. J., CROW, MOUNT, and PARKER, JJ., concur.