178 P.3d 960 (2008)
Josef VENTENBERGS, Kendall Trucking, Inc., a Washington Corporation, Ronald Haider, and Haider Construction, Inc., a Washington Corporation, Petitioners,
v.
The CITY OF SEATTLE, a Municipal Corporation, Seattle Public Utilities, and Chuck Clarke, in his official capacity as Director of Seattle Public Utilities, Waste Management of Washington, Inc., d/b/a Waste Management of Seattle, a Delaware Corporation, and Rabanco, Ltd., a Washington Corporation, Respondents.
No. 76954-1.
Supreme Court of Washington, En Banc.
Argued March 22, 2007.
Decided February 21, 2008.
*962 William R. Maurer, Michael E. Bindas, Institute for Justice/WA State Chapter, Seattle, WA, for Petitioners.
Gregory Colin Narver, City Hall, William Howard Patton, Foster Pepper PLLC, Suzanne Lieberman Smith, Seattle City Attorneys Office, Jessica L. Goldman, Polly L. McNeill, Summit Law Group PLLC, Andrew Michael Kenefick, Waste Management Inc./Legal Dept., David Welles Wiley, Attorney at Law, Dana Andrew Ferestien, Williams Kastner & Gibbs, Seattle, WA, for Respondents.
James K. Sells, Ryan Sells Uptegraft Inc. PS, Silverdale, WA, Amicus Curiae on behalf of Washington Refuse and Recycle Corporation.
Timothy M. Harris, Olympia, WA, Amicus Curiae on behalf of Building Industry Association of Washington.
BRIDGE, J.P.T.[*]
¶ 1 Since 1961, the Washington Utilities and Transportation Commission (WUTC) has regulated solid waste collection. However, pursuant to statute, the WUTC's jurisdiction over a solid waste collection company ends when that company contracts directly with a city. In the early 1990s the City of Seattle (City) decided to contract with solid waste handlers directly, thus ending WUTC's jurisdiction over the companies with which the City contracted. When the City decided to enter into direct contracts, only Rabanco and Waste Management were legally operating (i.e., they were in compliance with existing WUTC regulations) within the City. However, smaller companies, including Kendall Trucking (owned by petitioner Josef Ventenbergs and utilized by petitioner Ronald Haider), were providing collection services for construction, demolition, and land clearing waste (CDL), a specific type of solid waste. The City chose to contract with Rabanco and Waste Management to provide collection of "City's Waste" and CDL within Seattle. When the City learned that other collection companies were operating illegally, it enacted an ordinance establishing that CDL falls within the definition of "City's Waste," and thus could be collected only by Rabanco or Waste Management. We must now decide whether the City's code provisions restricting CDL collection to Rabanco and Waste Management impermissibly infringe upon the rights of Ventenbergs and Haider. We find that they do not and affirm the Court of Appeals.

I

Facts and Procedural History
¶ 2 Since 1961, the WUTC has regulated solid waste collection.[1] A company wishing to haul solid waste for profit must either obtain a certificate of necessity and convenience from the WUTC or enter into a contract with a municipality to provide waste collection services for that municipality. RCW 81.77.040 states, in relevant part, that
[n]o solid waste collection company shall hereafter operate for the hauling of solid waste for compensation without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation.
RCW 81.77.020 exempts from this requirement any company operating under a contract with a city or town. It states:
No person, his lessees, receivers, or trustees, shall engage in the business of operating as a solid waste collection company in this state, except in accordance with the *963 provisions of this chapter: PROVIDED, That the provisions of this chapter shall not apply to the operations of any solid waste collection company under a contract of solid waste disposal with any city or town, nor to any city or town which itself undertakes the disposal of solid waste.
RCW 81.77.040 grandfathered in all currently operating solid waste collection companies, granting them certificates without requiring compliance with the provisions of the chapter. When the WUTC scheme was enacted in 1961, 10 solid waste collection companies were operating in the City. Over the course of the next 40 years, due to a series of acquisitions and consolidations, Rabanco and Waste Management gained the exclusive rights to collect commercial waste within Seattle. Only these two companies possessed the requisite certificates of public convenience and necessity from the WUTC. However, due perhaps to a lack of enforcement of the WUTC regulations, numerous other small waste-collection businesses operated within the City at this time.
¶ 3 Upon the closure of its two landfills in the 1980s (and their declaration as superfund sites), the City decided to confront its solid waste problem by emphasizing recycling and environmental responsibility. To that end, in 1989 the City entered into residential solid waste collection contracts that provided for separate recycling collection and separate yard waste collection. To address the problem of the remaining solid waste, the City sought to enter a long-haul contract with a company that would transport waste to arid eastern Washington or Oregon. Seattle required that the landfills to which the waste would be taken comply with the more strict requirements of landfills in "wet weather" areas, thus providing greater environmental protection. In 1991, the City entered into such a contract with Waste Management, which took all of Seattle's solid waste to a landfill in Gillam County, Oregon.
¶ 4 Then in 1992, the City began considering entering into contracts for commercial solid waste collection for the purposes of (1) reducing rates to commercial generators of solid waste and (2) promoting recycling in the commercial sector. When the United States Supreme Court issued its decision in C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), a third objective arose: ensuring that the City could continue to dispose of its waste at the environmentally sound Gillam County landfill. In Carbone, the Court held that where a city did not have a municipal system of garbage collection but instead relied on private companies operating under individual contracts with customers, the city could not insist upon the collection companies taking the waste to its own transfer stations. See Carbone, 511 U.S. at 386, 114 S.Ct. 1677 (finding that by requiring solid waste to be processed at a designated transfer station before leaving the city, the city violated the commerce clause); see also id. at 394, 114 S.Ct. 1677 ("State and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities."). Thus, the City was concerned that if Waste Management decided to take the waste to a different disposal site, the City would have no recourse.
¶ 5 In 2001, after years of negotiations, the City finally entered into contracts with Rabanco and Waste Management for the collection of commercial solid waste within the City. Under the terms of the contracts, each company was responsible for collecting commercial solid waste in its respective zone. Additionally, each company was to exclusively provide for collection of CDL city-wide, without any restriction to a particular zone (thus giving potential customers the option of choosing which company to hire and requiring Rabanco and Waste Management to compete with each other to provide this service). The contracts specified that Rabanco and Waste Management would take commercial waste to specific transfer stations in the City and that the City reserved the right to direct disposal of CDL.
¶ 6 Under Seattle Municipal Code (SMC) 21.36.030, it is unlawful for anyone to haul "City's Waste" through the streets of Seattle, although that provision does provide for certain exceptions. One of these exceptions is for "[t]he City's solid waste contractors." SMC 21.36.030(C). However, the definition of *964 "City's Waste" at the time that the City entered into the contracts with Rabanco and Waste Management expressly excluded CDL: "`City's Waste' means all residential and nonresidential solid waste generated within the City, excluding Unacceptable Waste, Special Waste, Construction, Demolition and Landclearing Waste, and materials destined for recycling."[2] Former SMC 21.36.012(5) (2002) (emphasis added).
¶ 9 On May 22, 2002, Rabanco contacted the City to alert it to the fact that its profits had been reduced by approximately 40 percent, due apparently to unlicensed haulers operating in the city. Rabanco requested that the City honor its obligations under the contract and enforce the exclusivity provision. On October 7, 2002, the City enacted ordinance 120947, which removed CDL from the list of types of waste excluded from the definition of "City's Waste" in SMC 21.36.012.[3]
¶ 8 Josef Ventenbergs had started Kendall Trucking, Inc., in 1994. His business provided for collection of CDL, which involved providing containers for the waste and then hauling those filled containers to a transfer station. He attempted to obtain all of the proper licensing but states that he was never aware of the certificate requirement of RCW 81.77.040. Thus, although Ventenbergs maintained a business license from the City, he never had the required WUTC certificate. One of his best customers was Ronald Haider, a contractor who does primarily residential construction. Haider had always used Kendall Trucking to haul his construction waste, as he felt this service more suited his small business needs than did Rabanco and Waste Management.
¶ 9 On February 26, 2003, Ventenbergs received a letter from Seattle Public Utilities (SPU) stating that under SMC 21.36.030 only Rabanco and Waste Management could collect CDL. In response, on May 13, 2003, Ventenbergs and Haider sued the City, SPU, and Chuck Clarke, director of SPU.[4] The complaint alleged that (1) SMC 21.36.012(5) and .030 violate the privileges and immunities clause of the Washington constitution, article I, section 12; and (2) that those provisions of the SMC impaired a contract between Ventenbergs and Haider, in violation of article I, section 23 of the Washington constitution.[5] The parties filed cross motions for summary judgment, and on February 23, 2004, the trial court granted summary judgment in favor of the defendants. It found that hauling solid waste within the City is not a fundamental right to which the privileges and immunities clause would pertain, and that because solid waste collection is within a municipality's police powers, it was entitled to contract with whomever it chose to exercise this power.[6] The Court of Appeals affirmed, reiterating that a city has broad discretion to take action under its police powers and that solid waste collection is clearly an issue of health and safety that comes within these powers. Ventenbergs v. City of Seattle, noted at 125 Wash.App. 1043, 2005 WL 351697, 2005 Wash.App. LEXIS 290 (unpublished). On April 20, 2004, Ventenbergs filed a motion for discretionary review in this court, which we accepted at 158 Wash.2d 1029, 152 P.3d 1033 (2007).[7]

*965 II

Analysis

Police Powers
¶ 10 Article XI, section 11 of the Washington Constitution gives local governments the general power to enact and enforce police and sanitary regulations. RCW 70.95.020(1) explicitly delegates the primary responsibility for solid waste handling to local governments. Although a city may contract with a private entity for solid waste handling, the municipality remains ultimately responsible for adequate waste management. RCW 70.95.020; Weyerhaeuser v. Pierce County, 124 Wash.2d 26, 41, 873 P.2d 498 (1994) ("[R]egardless of whether the County deals with a private company, the collection and disposal of solid waste is the County's responsibility."). This court has explicitly held that solid waste handling is a governmental function. E.g., Citizens for Clean Air v. City of Spokane, 114 Wash.2d 20, 39, 785 P.2d 447 (1990) ("Disposal of solid waste is a recognized governmental function."); King County v. City of Algona, 101 Wash.2d 789, 794, 681 P.2d 1281 (1984) (same). In Weyerhaeuser the court expanded upon this concept, explaining that
"[t]he accumulation of garbage and trash within a city is deleterious to public health and safety. The collection and disposal of garbage and trash by the city constitutes a valid exercise of police power and a governmental function which the city may exercise in all reasonable ways to guard the public health. It may elect to collect and dispose of the garbage itself or it may grant exclusive collection and disposal privileges to one or more persons by contract, or it may permit private collectors to make private contracts with private citizens. The gathering of garbage and trash is considered to be a matter which public agencies are authorized to pursue by the best means in their possession to protect the public health. . . . "
Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498 (emphasis added) (second alteration in original) (quoting Shaw Disposal, Inc. v. City of Auburn, 15 Wash.App. 65, 68, 546 P.2d 1236 (1976)).
¶ 11 RCW 70.95.030(23) defines solid waste as "all putrescible and nonputrescible solid and semisolid wastes including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction wastes, abandoned vehicles or parts thereof, and recyclable materials."[8] (Emphasis added.) Therefore, collection and disposal of CDL plainly falls within the ambit of a city's police powers. However, even though a municipality has broad authority when it acts under these powers, it exceeds this authority if it "`violate[s] any direct or positive mandate of the constitution.'" Campbell v. State, 12 Wash.2d 459, 465, 122 P.2d 458 (1942) (quoting Shea v. Olson, 185 Wash. 143, 153, 53 P.2d 615 (1936)). Additionally, the municipality must exercise its police power in a reasonable manner. See Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498. Thus, we must determine whether the ordinances here are in conflict with constitutional mandates and whether the City exercised its police power in a reasonable way.
A. Article I, section 12
¶ 12 Ventenbergs argues that by granting contracts exclusively to Rabanco and Waste Management, the City violated article I, section 12 of the Washington constitution. That provision states:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not *966 equally belong to all citizens, or corporations.
¶ 13 In Grant County Fire Protection District No. 5 v. City of Moses Lake, 150 Wash.2d 791, 812, 83 P.3d 419 (2004), we stressed that "not every statute authorizing a particular class to do or obtain something involves a `privilege' subject to article I, section 12." Rather, "`privileges and immunities' `pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship.'" Id. at 812-13, 83 P.3d 419 (emphasis added) (quoting State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902)). Thus, we must determine whether the right at issue here is fundamental.
¶ 14 Ventenbergs argues that the "`right to hold specific private employment'" is a fundamental right of citizenship.[9] Pet. for Review at 10 (quoting Plumbers & Steamfitters Union Local 598 v. Wash. Pub. Power Supply Sys., 44 Wash.App. 906, 915, 724 P.2d 1030 (1986)). Ventenbergs misframes the issue. The type of employment that Ventenbergs seeks is not private  it is in a realm belonging to the State and delegated to local governments. See RCW 70.95.020. In Grant County we found that because the power to adjust the boundaries of municipal corporations lies entirely with the legislature, citizens had no fundamental right of citizenship to seek or prevent annexation. Grant County, 150 Wash.2d at 813-14, 83 P.3d 419. Similarly, because the power to regulate solid waste collection lies entirely with the legislature and local governments, Ventenbergs has no fundamental right of citizenship to provide this governmental service. Therefore, just as we did in Grant County, we find that there is no fundamental right to provide this governmental service because "[t]he power is entirely that of the legislature, which may delegate to the cities." Grant County, 150 Wash.2d at 814, 83 P.3d 419.[10]
B. Reasonableness
¶ 15 Although a city has broad discretion when acting under its police powers, it must act in a reasonable way.[11]See Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498. Therefore, although we find that Ventenbergs's claim fails under article I, section 12 because the right at issue is not fundamental, we must still determine whether the City acted reasonably in deciding to contract only with Rabanco and Waste Management.
¶ 16 Although Ventenbergs alleges that the City contracted with Rabanco and Waste Management solely to avoid a lawsuit, the City has proffered other reasons for which it chose these two businesses. First, Rabanco and Waste Management were the only two businesses operating legally at the time the City decided to take over regulation of waste collection. Clerk's Papers (CP) at 414. The City's decision not to contract with illegally operating businesses is not unreasonable.
¶ 17 Second, the City was concerned with the health and safety implications of waste management, given its prior experience with its landfills being designated superfund sites. CP at 415. Because Rabanco and Waste Management utilized environmentally sound *967 landfills, the City had a "much higher degree of confidence" that waste would end up in appropriate places. CP at 1611-12. The City sought to dispose of waste in landfills in eastern Washington and eastern Oregon that met the more stringent requirements for landfills built in the western portions of these states, and Rabanco and Waste Management assured the City that it would do so. See CP at 447, 989.
¶ 18 Finally, the City determined to limit the number of contractors so that it could establish uniform delivery standards, while at the same time promoting competition. CP at 1617. The City had studied the issues that the city of Portland faced when it had numerous service providers and found that having a large number of waste collectors led to "confusion among customers, no uniform standards for collection equipment or containers, [and] no uniform standard for the services being provided." CP at 1616-17. At the same time, the City decided to contract with more than one company in order to promote competition and keep rates low. CP at 1617. We find that all of these reasons proffered by the City indicate that it was reasonable under its police powers for the City to have chosen to contract with Rabanco and Waste Management, and find that the City did not improperly limit collection of CDL to these two businesses.

Right To Alienate Property
¶ 19 Haider argues that the City infringed upon his right to freely alienate his property when it required him to dispose of CDL with only Rabanco or Waste Management. See Opening. Br. of Appellant at 44-45. Haider cites Manufactured Housing Communities of Washington v. State, 142 Wash.2d 347, 364, 13 P.3d 183 (2000), in which we stated that "`[p]roperty in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal.'" (Emphasis omitted) (internal quotation marks omitted) (quoting Ackerman v. Port of Seattle, 55 Wash.2d 400, 409, 348 P.2d 664 (1960).)
¶ 20 Haider points to no case, however, in which we have found a right to freely dispose of solid waste. To the contrary, "`[t]he gathering of garbage and trash is considered to be a matter which public agencies are authorized to pursue by the best means in their possession to protect the public health.'" Shaw Disposal, 15 Wash.App. at 68, 546 P.2d 1236 (quoting Davis v. City of Santa Ana, 108 Cal.App.2d 669, 239 P.2d 656, 660-61 (1952)). Furthermore, nothing in the statutes or municipal code at issue prevents Haider from hauling his own construction debris  he is required to employ the services of Rabanco or Waste Management only if he chooses not to haul the debris himself. Therefore, we find that the City did not infringe upon his right to freely alienate his property.

Compliance with Bidding Procedures
¶ 21 Ventenbergs next claims that Seattle violated the provisions of RCW 35.21.156 by failing to comply with the bidding process set forth in that statute. Opening Br. of Appellant at 39. The City responds that that provision applies only to waste facilities and thus it was not required to follow the procedural mandates of that provision. Amended Br. of Resp't Seattle at 39-40.
¶ 22 RCW 35.21.156(1) sets forth the procedures for a municipality to follow when contracting with vendors for services for "the design, construction, or operation of, or other service related to, the systems, plants, sites, or other facilities for solid waste handling." (Emphasis added.) Thus, we must determine whether this provision applies to the City's contracts with Rabanco and Waste Management.
¶ 23 To determine the meaning of RCW 35.21.156, we look to the surrounding provisions. RCW 35.21.120 states, in relevant part, that "[a] city or town . . . may award contracts for any service related to solid waste handling[[12]] including contracts entered into under RCW 35.21.152." (Emphasis added.) RCW 35.21.152 in turn states that

*968 [a] city or town may enter into agreements with public or private parties to: (1) Construct, lease, purchase, acquire, manage, maintain, utilize, or operate publicly or privately owned or operated solid waste handling systems, plants, sites, or other facilities; (2) establish rates and charges for those systems, plants, sites, or other facilities; (3) designate particular publicly or privately owned or operated systems, plants, sites, or other facilities as disposal sites; and (4) sell the materials or products of those systems, plants, or other facilities.
(Emphasis added.) By referring specifically to "systems, plants, sites, or other facilities," the statute expressly reaches a subset of services related to solid waste handling, not "any service" as referenced by RCW 35.21.120. The fact that it refers to these "systems, plants, sites, or other facilities" as "disposal sites" that can produce "materials or products" indicates that it is not referencing collection.[13] Thus, when this same "systems, plants, sites, or other facilities" language is used in RCW 35.21.156, it becomes apparent that that provision does not mandate that a city follow the bidding procedures to contract for all services related to solid waste handling, but rather that it applies only to that particular subset. Because the City's contracts with Rabanco and Waste Management are not for these services, the provisions of RCW 35.21.156 do not apply to them.

City's Authority
¶ 24 Ventenbergs argues that "a city's monopolization of CDL hauling exceeds the statutory authority granted to municipalities by the legislature." Pet. for Review at 17 n. 5. However, as discussed above, the legislature has expressly delegated the authority for solid waste management to local government. See RCW 70.95.020. We have explained in the past that a city may exercise its police power over solid waste management "`in all reasonable ways to guard the public health. It may elect to collect and dispose of the garbage itself or it may grant exclusive collection and disposal privileges to one or more persons by contract.'" Weyerhaeuser, 124 Wash.2d at 40, 873 P.2d 498 (emphasis added) (quoting Shaw Disposal, 15 Wash.App. at 68, 546 P.2d 1236). Additionally, we have stated that "[o]rdinances conferring the exclusive right to collect garbage and refuse substances upon some department of the city government, or upon a contractor with the city, have almost universally been sustained." Smith v. City of Spokane, 55 Wash. 219, 221, 104 P. 249 (1909) (emphasis added).[14]
¶ 25 As discussed above, it was reasonable for the City to contract with only Rabanco and Waste Management. Its decision to contract with these companies fell within the authority to manage solid waste as delegated to it by the legislature. We therefore find that the City did not exceed the authority given to it by the legislature when it chose to contract solely with these two companies.

Sanctions
¶ 26 Finally, Ventenbergs argues that the Court of Appeals erred when it refused to impose sanctions on the City for *969 appending "unidentified, unauthenticated materials it called `legislative history.'" Pet. for Review at 19. RAP 10.7 states that a court will "ordinarily" order sanctions for submitting an improper brief; however, the rule does not require the court to do so. We find that the Court of Appeals acted within its discretion when it refused sanctions here.

III

Conclusion
¶ 27 The Ninth Circuit Court of Appeals has stated that "[o]ne could hardly imagine an area of regulation that has been considered to be more intrinsically local in nature than collection of garbage and refuse, upon which may rest the health, safety, and aesthetic well-being of the community." AGG Enter. v. Washington County, 281 F.3d 1324, 1328 (9th Cir.2002). We agree. The City acted reasonably under its police powers and the authority delegated to it by the legislature. In deciding to contract with Rabanco and Waste Management, the City did not impermissibly infringe upon the rights of the petitioners. We therefore affirm the Court of Appeals.
WE CONCUR: Justice SUSAN OWENS, Justice CHARLES W. JOHNSON, Justice MARY E. FAIRHURST, and Justice BARBARA A. MADSEN.
CHAMBERS, J. (concurring).
¶ 28 I reluctantly concur. While I share many of the concerns expressed in the dissent, I write separately to note that our decision today rests on this court's long-standing interpretation of article I, § 12 of our state constitution. Given that garbage collection is a government function, the State and its subdivisions have considerable power to regulate it. Whether the City of Seattle's ordinances or practices violate antitrust law is not before us.
SANDERS, J. (dissenting).
¶ 29 The issue here is whether a municipality may constitutionally grant an exclusive franchise to two corporations to haul construction, demolition, and land clearing (CDL) debris while categorically denying like privilege to all others.
¶ 30 As noted by the majority at 963-64, the ordinance in question[1] was enacted at the request of one of the privileged CDL haulers, Rabanco, which, on May 22, 2002, "contacted the City [of Seattle] to alert it to the fact that its profits had been reduced by approximately 40 percent, due apparently to unlicensed haulers operating in the city." Majority at 964. Accordingly the City simply legislated all competitors to Rabanco and Waste Management out of business  Ventenbergs among them. By necessary consequence all preexisting and potential private customers of the excluded haulers lost the opportunity to contract with haulers they found superior to the city's designated private monopolists.
¶ 31 This no doubt enhanced the profits of Rabanco and Waste Management; however, I posit, enhanced corporate profit is too high a price to pay for the abrogation of any citizen's constitutional rights, including those secured by Washington's privileges and immunities clause, Constitution article I, section 12. This provision of our Declaration of Rights simply and broadly provides:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
Const. art. I, § 12.
¶ 32 As suggested by its language, the guaranty is absolute on its face ("No law shall be passed. . . ."); moreover, "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Const. art. I, § 29. When applying this provision, as others, we are reminded by the constitution itself that "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Const. art. I, § 32.
¶ 33 Of course the purpose of this provision of the Declaration of Rights, as well as others, is to protect the citizen from governmental *970 actions. It is therefore an exception to what government might otherwise be lawfully empowered to do, as is the federal Bill of Rights also an exception to what the United States government might lawfully do under those powers delegated to it through the United States Constitution. Alexander Hamilton articulated the principle when he argued eloquently against the incorporation of a Bill of Rights into the original United States Constitution because such an inclusion would purport to "contain various exceptions to powers which are not granted; and on this very account, would afford a colourable pretext to claim more than were granted." The Federalist No. 84, at 579 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).
¶ 34 I make this observation to summarily render irrelevant the majority's belabored claim that local government has a legitimate police power interest in the reasonable regulation of solid waste disposal reinforced by state statute. The existence of a governmental power is simply no answer to a claim that a person's privileges and immunities rights have been abridged by the manner in which the government undertakes to accomplish its objective. This is to say the very obvious function of our Declaration of Rights, just as the federal Bill of Rights, is to preclude government from exercising its otherwise legitimate powers in a way which offends enumerated individual rights.[2] Similarly, it goes without saying that local government functions even expressly authorized by state statute are no less subordinate to the ultimate demands of our constitution's Declaration of Rights.
¶ 35 So let us consider the privileges and immunities clause in this light: governmental action, no matter how characterized, no matter how expedient, no matter how meritorious, which nonetheless abridges those rights secured by the privileges and immunities clause, or any clause in the Declaration of Rights, cannot stand.
¶ 36 The privileges and immunities clause was adopted as part of the original state constitution, remaining unchanged since. At least 17 other states besides Washington have similar proscriptions on privileges and immunities,[3] while some states have similar prohibitions on "special laws,"[4] and other states require general laws to have a uniform operation.[5] Washington's clause was closely modeled after article I, section 20 of Oregon's Constitution of 1857,[6] which in turn took its language from article I, section 23 of Indiana's Constitution of 1851[7] except for one critical difference: the word "corporation" was inserted. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 501 n. 20 (Beverly Paulik Rosenow ed., 1999).
¶ 37 The origin of the privileges and immunities clause is steeped in history. In the 1640s antiroyalists published a pamphlet calling for an abolition of all royal privileges "`whereby some persons are exempt from the force and power thereof, to the insufferable vexation and ruine of miltirudes of distressed people, may be forthwith abrogated" *971 and demanding "`[t]hat all Monopolyes be forthwith removed, and no persons whatsoever may be permitted to restraine others from free trade.'" David Schuman, The Right to "Equal Privileges and Immunities": A State's Version of "Equal Protection," 13 VT. L.REV. 221, 222 & n. 9 (alteration in original) (1988) (quoting The Case of the Army Truly Stated (1647) in D. WOLFE, LEVELLER MANIFESTOES OF THE PURITAN REVOLUTION 216, 215 (1944)); see also Darcy v. Allein, 77 Eng. Rep. 1260 (K.B. 1602) (commonly known as The Case of Monopolies, where Lord Coke opined monopolies are inherently harmful to the public good and contrary to the common law); Taylor v. Blanchard, 95 Mass. (13 Allen) 370, 372 (1866) (stating "[t]he law has always regarded monopolies as hostile to the rights and interests of the public. One method of obtaining them in early times was by a grant from the sovereign to a particular individual of the sole right to exercise a particular trade. The mischief arising from these monopolies became so intolerable that the practice was suppressed by a clause in Magna Charta.")[8]
¶ 38 In the infancy of this country, a similar prohibition appeared for the first time as a constitutional guaranty in the Virginia Declaration of Rights of 1776 stating, "no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of publick services." 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 231-34 (1971). Several of the original colonies shortly followed suit. Id. at 256 ("The Virginia Declaration of Rights set the example for eight of the 12 states which framed new Constitutions during the Revolutionary period.").
¶ 39 These original states took the generally antiroyalist view, imbued with natural law principles of liberty and equality, and set it down in a positive law proscription that no man, or set of men, may be granted privileges not granted to everyone in the community. See Holden v. James, 11 Mass. 396, 405 (1814) (stating "[i]t is manifestly contrary to the first principles of civil liberty and natural justice, and to the spirit of our constitution and laws, that any one citizen should enjoy privileges and advantages which are denied to all others under like circumstances. . . ."); see also Wally's Heirs v. Kennedy, 10 Term. (2 Yer.) 554, 555 (1831) (stating the reason no special privileges are permitted is because "[w]ere it otherwise, . . . corporate bodies[] would be governed by one law, the mass of the community, and those who made the law, by another").
¶ 40 During the mid-nineteenth century "many states amended their constitutions to curb the granting of `special' or `exclusive' privileges, after a series of abuses by the relatively unfettered state legislatures responding to powerful economic interests." Robert F. Williams, Equality Guarantees in State Constitutional Law, 63 TEX. L.REV. 1195, 1207 (1985). During this time some states explicitly included corporations among the entities prohibited from receiving special treatment, reflecting the contemporary distrust of corporate power.[9] As William Hurst noted regarding state constitutions such as Indiana's and Oregon's dating from this era,
"The persistent theme of the limitations written into state constitutions after the 1840's was the desire to curb special privilege. The trend began with general or detailed prohibitions on the enactment of "special" or "local" legislation. . . .

*972 " . . . [I]ts stimulus was in revealed fraud and corruption in public-land dealings and in the getting and granting of franchises, subsidies, and rate privileges for turnpikes, canals, river improvements, toll bridges, and, of course, especially railroads and street railways."
Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?, 69 TEMP. L.REV. 1247, 1253 n. 31 (1996) (quoting JAMES W. HURST, THE GROWTH OF AMERICAN LAW: THE LAW MAKERS 241-42 (1950)).
¶ 41 For example, 12 years after Slaughter-House Cases, 83 U.S. (16 Wall) 36, 21 L.Ed. 394 (1872) had held a Louisiana legislative act of 1869 granting a certain company the exclusive privilege of slaughtering animals for food within New Orleans did not violate the privileges and immunities clause of the Fourteenth Amendment (while allowing that same might violate similar provisions of a state constitution),[10] the Louisiana Supreme Court held the act was void by a subsequent state constitutional amendment prohibiting monopolies.[11]Howell v. Butchers' Union Slaughterhouse & Livestock Landing Co., 36 La. Ann. 63 (1884). The local government could regulate the how and where slaughtering could occur, but the state constitution prohibited any grant of exclusive privilege to one company. Id.
¶ 42 Similarly in City of Chicago v. Rumpff, 45 Ill. 90, 96, 97-98 (1867), the Illinois Supreme Court held a grant of an exclusive privilege was unconstitutional because "privileges . . . should be open to the enjoyment of all, upon the same terms and conditions [otherwise] . . . [i]f the common council may require all of the animals for the consumption of the city to be slaughtered in a single building or on a particular lot . . . what would prevent the making a similar contract with some other person, that all of the vegetables, or fruits, the flour, the groceries, the dry goods, or other commodities, should be sold on his lot. . . .?"; see also City of Hudson v. Thorne, 7 Paige Ch. 261 (N.Y.Ch.1837) (stating "common council cannot make a by-law which shall permit one person to carry on the dangerous business, and prohibit another, who has an equal right, from pursuing the same business"); Norwich Gas Light Co. v. Norwich City Gas Co., 25 Conn. 19 (1856) (holding a grant to a corporation for the exclusive right to lay gas pipes in the streets of a city is void as being a monopoly).
¶ 43 The rationale behind the prohibition on granting exclusive privileges was forcefully articulated by the Alabama Supreme Court in 1885:
In the struggling infancy of States and communities, the temptation has been very great to offer [exclusive privileges], as a reward to the investment of capital. The injustice and inequality of their operation have only been illustrated in the light of the rapid increase of our population, the steady growth of our wealth, and the wonderful discoveries of modern science. It now more fully becomes manifest that they prove iron bands to fetter the growth of public industry, enterprise, and commerce. Free competition in all departments of commercial traffic is justly deemed to be the life of a people's prosperity. The policy of the law, as now declared by our constitution, is as clear in the condemnation of the grant of irrevocable exclusive privileges conferred by franchise, as that of the common law was in the reprobation of pure monopolies, which were always deemed odious, not only as being in contravention of common right, but as founded in the destruction of trade by the extinguishment of a free and healthy competition.
Birmingham & Pratt Mines St. Ry. Co. v. Birmingham St. Ry. Co., 79 Ala. 465, 474-75 (1885).
¶ 44 With this background in mind, I turn to the sociopolitical climate in the Washington Territory preceding the 1889 adoption of Washington's privileges and immunities clause. "During the early period [of the Washington Territory], the legislature spent much of its time granting special acts or privileges. . . . [P]rivate laws authorizing the *973 building of bridges, the establishing of ferries, or the incorporating companies often with nearly monopolistic powers, were passed regularly." 1 Wilfred J. Airey, A History of the Constitution and Government of Washington Territory 208 (1945) (footnote omitted) (unpublished Ph.D. dissertation, Univ. of Wash.) (on file with Wash. State Law Library). For example, during the 1862-63 legislative session the legislature enacted 150 private acts, the majority being grants of monopolies or special charters. One newspaper at the time stated, "`the whole Democratic strength of the House and Council inaugurated a perfect system of logrolling for private interests against the general welfare.'" Id. at 210 (quoting Washington Standard, Feb. 6, 1864).
¶ 45 By the time the constitutional convention convened on July 4, 1889 in Olympia, the purpose of the special privileges and immunities prohibition was evident: it was "a response to perceived manipulation of lawmaking processes by corporate and other powerful minority interests seeking to advance their interests at the expense of the public." Thompson, supra, at 1253.[12] The framers drafted the constitution with the purpose of protecting "personal, political, and economic rights from both the government and corporations, and they strove to place strict limitations on the powers of both." Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L.REV. 491, 519 (1984). See also Grant County Fire Prot. Dist. v. City of Moses Lake, 150 Wash.2d 791, 808, 83 P.3d 419 (2004) ("Washington's addition of the reference to corporations demonstrates that our framers were concerned with undue political influence exercised by those with large concentrations of wealth. . . ."); Lebbeus J. Knapp, Origin of the Constitution of the State of Washington, WASH. HIST. Q. 227, 228 (1913) (stating Washington's constitution "fully and explicitly" restricts the legislative "power to grant any person or class of persons any exclusive political honors or privileges").
¶ 46 This purpose is reflected in the plain meaning of the clause itself.[13] In 1889, as Ventenbergs correctly states in his brief, a "`Privilege'" meant "`[a] right peculiar to the person on whom conferred, not to be exercised by another or others.'" Opening Br. of Appellant at 16 (quoting A Dictionary of the Law 811 (1889)). A "`Special or exclusive privilege'" meant "`[a]ny particular or individual authority or exemption existing in a person or class of persons, and in derogation of common right; as, the grant of a monopoly.'" Id. (quoting A Dictionary of Law at 812 (emphasis in original)). Thus, the plain meaning of the provision at the time of its adoption prohibits the legislature from derogating the common right of all for the benefit of one "citizen, class of citizens, or corporation."[14] Const. art. I, § 12; see also Const. art. I, § 8 ("No law granting irrevocably any privilege, franchise or immunity, shall be passed by the legislature."); Const. art. XII, § 22 ("Monopolies and trusts shall never be allowed in this state. . . . ").
*974 ¶ 47 A digression into what is meant by a monopoly may be in order to fully understand majority's misinterpretation of the interest at stake. The Supreme Court of the United States stated:
A monopoly . . . is an exclusive privilege conferred on one, or a company, to trade or traffick [sic] in some particular article; . . . in derogation of a common right. Every man has a natural right to buy and sell . . .; but when this right, which is common to all, is conferred on one, it is a monopoly, and as such, is justly odious. . . . [as] something carved out of the common possession and enjoyment of all, and equally belonging to all, and given exclusively to one.
Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 36 U.S. (11 Pet.) 420, 451, 9 L.Ed. 773 (1837).
¶ 48 Since the Seattle ordinance carves out the common right to collect CDL waste for the benefit of two corporations, it grants a monopoly to those two corporations. There may be a distinction between collecting and disposing construction debris, a common right belonging to anyone interested in collecting debris, and collecting waste, a possibly prescribable activity due to its pernicious effects on the public. But see City of Spokane v. Carlson, 73 Wash.2d 76, 436 P.2d 454 (1968) (observing no distinction between odious and innocuous refuse). See also Smith v. City of Spokane, 55 Wash. 219, 220 104 P. 249 (1909) (holding exclusive disposal of "all manure, garbage, offal, refuse, rubbish, dead animals, or any vegetable or animal matter" was a proper exercise of police power). However, whether Seattle can exclusively collect its own waste or its citizens' residential waste is irrelevant because collecting CDL debris, prior to the challenged ordinance, was of common right, a lawful enterprise anyone could enjoy prior to the enactment of the ordinance.[15] Nor does our "garbage collection" jurisprudence support its ordinance. Concurrence at 969.
¶ 49 In Smith[16] the court assumed, as a factual matter, the exclusive franchise to collect garbage was necessary to promote a critical public health and safety interest. See Smith, 55 Wash. at 221, 104 P. 249; see also Br. of Appellant (Smith, Wash. Sup.Ct. No. 7897) (1909). Similarly, in Carlson, 73 Wash.2d at 83, 436 P.2d 454, the respondent was unable to meet his burden of proof to show the challenged ordinance was unrelated to a legitimate end. Both Smith and Carlson, however, support the proposition that an exclusive franchise is valid only if it is necessary to achieve a critical public health or safety goal. See Smith, 55 Wash. at 221, 104 P. 249 ("[A]n ordinance which [directly promotes public health] is a proper exercise of the police power."); Carlson, 73 Wash.2d at 82, 436 P.2d 454 ("[I]n the exercise of the police power, the city may enact all laws necessary for the comfort, safety, and well-being of the city. . . ." (emphasis added)). If an ordinance granting an exclusive franchise *975 is the only means necessary to achieve a legitimate public health and safety objective, then an incidental burden on the privileges and immunities guaranty may be no hindrance to the attainment of that legitimate public necessity. However, if an exclusive franchise is not the only necessary means or if the invocation of the police power is a pretext to some other goal, unrelated to a public health or safety necessity, then the privileges and immunities guaranty prohibits the exclusive franchise. See River Rendering Co. v. Behr, 7 Mo.App. 345, 355 (1879), overruled on other grounds by 77 Mo. 91 (1882); Smiley v. MacDonald, 42 Neb. 5, 12-13, 60 N.W. 355 (1894); and In re Vandine, 23 Mass. (6 Pick.) 187, 191 (1828); see also Homes Unlimited, Inc. v. City of Seattle, 90 Wash.2d 154, 158, 579 P.2d 1331 (1978) (stating the valid exercise of police powers "requires that they be reasonably necessary to protect the public health, safety, morals, and general welfare and that they be substantially related to the legitimate ends sought." (emphasis added)). The assumptions made in the Smith and Carlson decisions are exactly in issue here: the ordinance is neither necessary nor substantially related to a legitimate exercise of police power. As succinctly stated by Justice Hill, "[t]he sole issue in this case is not whether [debris] shall be removed, but who shall remove [it]." Carlson, 73 Wash.2d at 84, 436 P.2d 454 (Hill, J., dissenting).
¶ 50 Under the ordinance the owner of the CDL debris may lawfully remove it himself  only he may not contract for its disposal with any company other than the designated monopolist: Waste Management and Rabanco. However, this monopoly grant is not necessary or substantially related to the promotion of the traditional police power interest of health and safety,[17] and our case law consistently renders this type of legislation void. See, e.g., In re Habeas Corpus of Camp, 38 Wash. 393, 80 P. 547 (1905); City of Seattle v. Dencker, 58 Wash. 501, 108 P. 1086 (1910); Ralph v. City of Wenatchee, 34 Wash.2d 638, 209 P.2d 270 (1949).
¶ 51 In Camp, 38 Wash. at 397, 80 P. 547, we struck down an ordinance prohibiting the peddling of produce within Spokane's city limits excepting farmers selling their own produce, on article I, section 12 grounds. The court found the city had the power to regulate produce peddling as a nuisance, but the ordinance violated article I, section 12 because "[o]ne class [was] permitted to indulge in the nuisance [while] others [were] unconditionally prohibited." Id.
¶ 52 In Dencker, 58 Wash. at 510, 108 P. 1086, we struck down an ordinance taxing vending machines but not in-person sales on article I, section 12 grounds because "[t]he tendency of this kind of an income is to foster monopolies, for a monopoly exists when the manufacture and sale of any commodity is restrained to one or a certain number." The court concluded, "[i]f this ordinance can be sustained, . . . the constitutional guaranty [of article I, section 12] becomes a dead letter." Id. at 510-11, 108 P. 1086.
¶ 53 In Ralph, 34 Wash.2d at 643-44, 209 P.2d 270, we struck down a city ordinance requiring "itinerant" photographers to be licensed by the city on article I, section 12 (as well as Fourteenth Amendment) grounds. The court found the city had an interest in protecting the public from "unlicensed and uncontrolled" itinerant photographers. However, since the ordinance was applicable only to this class of photographers and was passed primarily to prohibit competition, it was invalid because "[it] was . . . designed to serve private interests in contravention of common rights, [as such] it must be condemned as an abuse of the police power, and, therefore, unreasonable and unlawful." Id. at 644, 209 P.2d 270.
¶ 54 The rule in these cases is clear: restricting different providers of the same service violates article I, section 12. Nor is Washington alone in this rule. See, e.g., White v. Holman, 44 Or. 180, 74 P. 933 (1904) (holding the refusal to grant a license to operate a sailors' boarding house for the purpose of maintaining only one boarding house in Portland to promote the welfare of the public and advance shipping interests violated the state constitution's privileges and immunities clause); Moler v. Whisman, *976 243 Mo. 571, 147 S.W. 985 (1912) (holding a state statute prohibiting barber colleges from advertising and students at barber colleges from charging for their services to protect the public health creates a monopoly for those already skilled in the trade by discouraging others from learning the trade in violation of the state's constitutional proscription on legislative grants of exclusive privileges); City of Tulsa v. Thomas, 89 Okla. 188, 214 P. 1070 (1923) (holding a neutral ordinance regulating the jitney business was actually intended to confer an exclusive franchise in the business in violation of the state's constitutional proscription on granting exclusive franchises).
¶ 55 These cases are not to be celebrated as Lochner-esque[18] laissez faire antagonism toward socioeconomic legislation arising under the due process clause; rather, these cases disclose a fundamental concern with a particular form of political dealmaking, limiting sovereign police powers at the threshold of fundamental rights, exemplifying the purpose of article I, section 12. See Yelle v. Bishop, 55 Wash.2d 286, 291, 347 P.2d 1081 (1959) ("In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered."); see also Thompson, supra, at 1262 ("The view that there is a tendency among lawmakers to produce legislation effecting a transfer from inherently unorganized to organized interests underlies state constitutional prohibitions on special privileges and immunities. . . ."); Knapp, supra, at 239-40 (discussing the founders' keen awareness of the growing state's need for corporate wealth with the necessity of curbing "unscrupulous power. . . . to prevent such legislation, under the influence of passion or prejudice as should be unjust to those who risk their fortunes on legitimate corporate enterprises").
¶ 56 Fundamentally, "[f]or a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens." Grant County, 150 Wash.2d at 812, 83 P.3d 419.[19] Here the question really boils down to whether granting two corporations to the exclusion of all others the exclusive privilege to haul CDL debris within the City of Seattle offends the equal privileges or immunities guaranty of those excluded.
¶ 57 We have stated not every governmental disparity of treatment between citizens necessarily involves a privilege of state citizenship. As opined in Grant County:
In this regard it must be remembered that not every statute authorizing a particular class to do or obtain something involves a "privilege" subject to article I, section 12. Instead, as this court made quite clear early in this State's history, the terms "privileges and immunities"
pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship. These terms, as they are used in the constitution of the United States, secure in each state to the citizens of all states the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from. [Thomas M.] Cooley, Constitutional Limitations (6th ed. [1890]) 597. By analogy these words as used in the state constitution should receive a like definition and interpretation as that applied to them when interpreting the federal constitution.

State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902); see also State ex rel. Cruikshank v. Baker, 2 Wash.2d 145, 150-51, 97 P.2d 638 (1940); Bussell v. Gill, 58 Wash. 468, 476, 108 P. 1080 (1910).
Grant County, 150 Wash.2d at 812-13, 83 P.3d 419.
*977 ¶ 58 As is apparent from the extended quotation from State v. Vance, and our early cases outlined above, "privileges" for the purpose of article I, section 12 often pertain to citizen involvement in economic activities. Also as explained above, one of the principal reasons the framers enacted this clause was to prevent economic favoritism in the grant of privileges to favored corporations by the government.
¶ 59 Keeping in mind the text of the clause as well as its historical and precedential context, we must determine the contours of the claimed fundamental right which constitutes a privilege of state citizenship. Here that asserted right is the right to earn a living in a lawful occupation free from unreasonable governmental interference. Unfortunately the majority mischaracterizes the claim as the "`right to hold specific private employment' is a fundamental right of citizenship." Majority at 966 (quoting Pet. for Review at 10 (citation omitted) (internal quotation marks omitted)).[20] As we noted in Farnam v. CRISTA Ministries, 116 Wash.2d 659, 680, 807 P.2d 830 (1991), one may distinguish between a claim that "the right to private employment is a fundamental right" and the holding in Duranceau v. City of Tacoma, 27 Wash.App. 777, 780, 620 P.2d 533 (1980), that "[t]he right to hold specific private employment free from unreasonable governmental interference is a fundamental right." (alteration in original) (quoted in Farnam, 116 Wash.2d at 680, 807 P.2d 830).
¶ 60 When properly articulated the right to hold private employment free from unreasonable governmental interference has been recognized as fundamental on numerous occasions. See Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ("[R]ight to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the `liberty' and `property' concepts of the Fifth Amendment."); New State Ice Co. v. Liebmann, 285 U.S. 262, 278, 52 S.Ct. 371, 76 L.Ed. 747 (1932) ("[N]othing is more clearly settled than that it is beyond the power of a state, `under the guise of protecting the public, arbitrarily [to] interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'" (second alteration in original) (quoting Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 513, 44 S.Ct. 412, 68 L.Ed. 813 (1924))); Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915) ("[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure."); Dent v. West Virginia, 129 U.S. 114, 121, 9 S.Ct. 231, 32 L.Ed. 623 (1889) ("It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition.").[21]
*978 ¶ 61 A right is fundamental under the privileges and immunities clause in the sense that it "belong[s], of right, to the citizens of all free governments; and which ha[s], at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign." Corfield v. Coryell, 4 Wash. C.C. 371, 6 F. Cas. 546, 551 (C.C.E.D.Pa.1823) (No. 3, 230). Of these rights, which belong to the citizens of a state by reason of such citizenship, the pursuit of a common calling free from unreasonable governmental interference is one of the most fundamental. Baldwin v. Fish & Game Comm'n, 436 U.S. 371, 387, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978); see also John C. Eastman, Re-evaluating the Privileges or Immunities Clause, 6 Chap. L.Rev. 123, 126 (2003) (discussing the "fundamental natural rights that every legitimate government [must] respect, including the freedom of contract  specifically, the common law right to earn a living at a lawful occupation, free from unreasonable government interference").
¶ 62 Furthermore, our state constitution protects an even broader panoply of rights for Washington citizens than they would otherwise enjoy under the federal constitution. The claim in Slaughter-House Cases, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394, was strikingly similar to that here  an exclusive franchise to favored butchers violated the privileges and immunities of those excluded. Although a divided Supreme Court in one of its most controversial decisions limited application of the Fourteenth Amendment's privileges and immunities clause exclusively to the rights associated with national citizenship, it was quick to hold the Fourteenth Amendment's privileges and immunities clause securing the entitlement of federal citizenship in no way limits the scope of privileges or immunities granted by state citizenship. Slaughter-House Cases, 83 U.S. at 74-75.
¶ 63 Both state and federal precedent have repeatedly recognized the fundamental right to hold specific private employment free from unreasonable government interference. Duranceau, 27 Wash.App. at 780, 620 P.2d 533. See also Plumbers & Steamfitters Union Local 598, 44 Wash.App. at 915, 724 P.2d 1030. Additionally, we have construed article I, section 12 to secure to citizens of this state "the right to remove to and carry on business therein," Vance, 29 Wash. at 458, 70 P. 34, and specifically protect corporations as well as citizens from unfair monopolies.
¶ 64 The majority does not dispute the fundamental nature of the right to hold private employment free from unreasonable governmental interference; however, it summarily dismisses the claim by asserting,
The type of employment that Ventenbergs seeks is not private  it is in a realm belonging to the State and delegated to local governments.
Majority at 966. This seems to be nothing more than a reformulation of the unsupported idea earlier noted that any governmental function pursued under the police power is somehow immune from challenge under the privileges and immunities clause "because the power to regulate solid waste collection lies entirely with the legislature and local governments, Ventenbergs has no fundamental right of citizenship to provide this governmental service." Majority at 965-66.
¶ 65 However, just because the government sees fit to contract with certain vendors to supply a lawful service does not necessarily mean the government may constitutionally preclude other private vendors from rendering the same lawful service. The problem here is that CDL collection is undertaken pursuant to a governmental fiat that two, and only two, private, for-profit corporations  to the exclusion of all others including Ventenbergs  are privileged to collect CDL from every private person in Seattle.
¶ 66 And just because local government may have an interest in conducting or regulating removal of debris does not mean the manner in which it advances that interest may not violate the privileges and immunities clause or any other provision of our Declaration of Rights. See State v. Talley, 122 Wash.2d 192, 199, 858 P.2d 217 (1993) ("A state's police power is limited, however, by constitutional protection afforded certain personal liberties."); Olympic Forest Prods., Inc. v. Chaussee Corp., 82 Wash.2d 418, 435, 511 P.2d 1002 (1973) ("An otherwise legitimate *979 exercise of the police power must fa[i]l if it violates specific constitutional requirements.").
¶ 67 Suppose, for example, the city attempted to exclude an outspoken political opponent from solid waste collection because he participated in a political campaign against the mayor. Does the majority claim the nature of the service rendered exempts the city from our constitution's free speech clause, article I, section 5? If the city were to restrict solid waste haulers to those of a particular religious affiliation, would the city be exempt from the religious freedom clause, article I, section 11? I know of no support for such a claim; certainly the majority doesn't provide it.[22]
¶ 68 The only authority cited by the majority to support its rather novel claim of governmental immunity from provisions of the Declaration of Rights is its citation to Grant County, 150 Wash.2d at 814, 83 P.3d 419, which rejects the notion that citizens of this state have a "fundamental right of citizenship to seek annexation" because "[t]he power is entirely that of the legislature, which may delegate to the cities." In context the Grant County court was simply stating its view that citizens have no fundamental right of citizenship to seek annexation because the whole idea, much less procedure, of annexation is no more "fundamental" than the statute which arbitrarily enacted it, a proposition with which I agree entirely. Here, however, the claim is not as mischaracterized by the majority: a "fundamental right of citizenship to provide this governmental service." Majority at 965-66. Rather, there is a fundamental right to engage in the same business as other favored private companies free from unreasonable governmental interference.
¶ 69 While we recognize the right to earn a living in a lawful occupation free from unreasonable governmental interference, the question remains whether this particular regulation is unreasonable. While ordinarily this presents an inherently factual question requiring a trial on the merits rather than summary judgment, I think the factual record before us demonstrates the city's only rationale for the exclusivity agreement is pure economic protectionism, whereas, by overwhelming authority, any rationale based on economic protectionism is inherently unreasonable.
¶ 70 Economic protectionism which results in protecting a discrete interest group from economic competition is subject to a virtually per se rule of invalidity. See City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Where an economic benefit or privilege is granted to a small and select group, as it is here, the classification must be based on "real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act in respect to which the classification is made." State ex rel. Bacich v. Huse, 187 Wash. 75, 84, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 948, 603 P.2d 819 (1979). Furthermore, municipal action that favors select enterprises, to the disadvantage of all competitors, is invalid unless the municipality can demonstrate that it has no other means to advance a legitimate local interest.[23]C & A Carbone *980 v. Town of Clarkstown, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Thus, regulations restraining a common right, such as the pursuit of business without unreasonable governmental interference, are not allowable on the grounds of mere desire, expediency, or convenience. Ragan v. City of Seattle, 58 Wash.2d 779, 780, 364 P.2d 916 (1961).
¶ 71 The city may not, even under the guise of its police power, prohibit "`particular classes of business, lawful in themselves, for the enrichment of another class.'" Ralph, 34 Wash.2d at 642, 209 P.2d 270 (quoting N.J. Good Humor, Inc. v. Bd. of Comm'rs, 124 N.J.L. 162, 168, 11 A.2d 113 (1940)). Government ordinances which restrain competition, create monopolies, or confer exclusive privileges should be generally condemned and have long been "`considered a species of fraud within the police power.'" Id. Such ordinances have the unfortunate result of "discourag[ing] enterprise, paralyz[ing] progress, [are] deprivation[s] of liberty, and [are] entirely inconsistent with the true principles and the genius of our government." Dencker, 58 Wash. at 511, 108 P. 1086. Thus, it follows that monopolies are "odious to the law," and the law should concern itself to "restrain rather than to nourish them." Id. at 510, 108 P. 1086.
¶ 72 The city of Seattle has offered no convincing or legitimate rationale why Rabanco and Waste Management should be granted a monopoly privilege to haul CDL debris to the exclusion of all others. First, the city has not established that restricting of the market and granting a monopoly to only two private hauling companies has a "substantial relation to the accomplishment of some purpose fairly within the legitimate range or scope of the police power." Wash. Kelpers Ass'n v. State, 81 Wash.2d 410, 417, 502 P.2d 1170 (1972) (emphasis added). The city contends there are important public health and safety justifications for regulating commercial waste and limiting competition to only Rabanco and Waste Management, which include 1) ensuring the city would continue to dispose of its waste at the environmentally sound Gilliam County, Oregon, landfill,[24] 2) reducing rates to commercial generators of solid waste, and 3) promoting recycling in the commercial sector. At his deposition, however, Ray Hoffman, the Director of Strategic Policy for Seattle Public Utilities, admitted none of the city's public health or safety interests were dependent on limiting competition. CP at 1615. Because the city's grant of an exclusive privilege to Rabanco and Waste Management, to the exclusion of all others, lacks a rational basis to the city's named objectives, the practical effect of the city's actions is to merely protect these two companies from competition.
¶ 73 Second, the city has not demonstrated its named objectives could not be achieved without restricting the market to these two companies. In fact, Mr. Hoffman indicated that the city's objectives could be achieved without restricting the market and creating an exclusive franchise: "The City can achieve its solid waste goals by contracting with one or more companies." CP at 923. Thus, the record fails to demonstrate the city's stated objectives could be achieved only "by the prohibition of what is in itself a completely lawful business" rather than by the use of alternative and reasonable regulatory measures. Ralph, 34 Wash.2d at 644, 209 P.2d 270. For instance, the city's objectives may justify an ordinance that regulates in what manner CDL debris is to be hauled. However fulfillment of the city's objectives does not justify enacting an ordinance restricting who can haul such debris. This is not an instance of the city collecting weekly universal garbage, but one where the city is prohibiting private individuals from freely contracting for specific CDL hauling requirements of other private persons. Insofar as Ventenbergs *981 and other similarly situated companies are deprived of the common right to engage in this legitimate business, the city's actions are arbitrary, unjust, oppressive, and are not even within the scope of its police power, not that that would excuse violation of the privileges and immunities clause in any event.
¶ 74 As the city has not established a legitimate public purpose for restricting the market to only two companies, the city is not constitutionally entitled to award exclusive privileges for CDL hauling because the restriction impermissibly creates a monopoly[25] and unreasonably interferes with Ventenbergs' fundamental right to engage in business as other private companies.
¶ 75 Although I also believe there may be a possible violation of the bidding statute, I find it unnecessary to consider this point since even if the city complied with the statute, such compliance cannot excuse a privileges and immunities violation.
¶ 76 This case presents a textbook example of governmental corporate favoritism to advance the profits of the privileged few at the expense, and the extinction, of any potential competitors. It flies in the face of the state's privileges and immunities clause which was adopted to combat this exact sort of unholy alliance between government and big business, which ultimately not only disserves the excluded businesses but also the public in general. The majority today embraces a devil the framers banished with article I, section 12. As William Shakespeare put it, "tell truth and shame the devil."[26]
¶ 77 Therefore, I must dissent.
WE CONCUR: Chief Justice GERRY L. ALEXANDER and Justice JAMES M. JOHNSON.
NOTES
[*] Justice Bobbe J. Bridge is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] "Solid waste" is defined as "all putrescible and nonputrescible solid and semisolid wastes including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction wastes, abandoned vehicles or parts thereof, and recyclable materials." RCW 70.95.030(23) (emphasis added).
[2] We note that although the Seattle Municipal Code did not prohibit the hauling of CDL at that time, state law nonetheless forbade this activity by persons who did not possess the required WUTC certificate. See RCW 81.77.040 (prohibiting hauling of solid waste for compensation); RCW 70.95.030(23) (including CDL within its definition of "solid waste"). Thus, the dissent is mistaken when it asserts that the collection of CDL was a "lawful enterprise" before the ordinance was enacted. See Dissent at 974.
[3] Again, the dissent misconstrues the facts when it states that the City "legislated all competitors to Rabanco and Waste Management out of business." Dissent at 969. In fact, state law proscribed the hauling of CDL without a WUTC certificate, which Ventenbergs did not possess. In enacting ordinance 120947, the City merely ensured that the SMC was consistent with state law.
[4] Although the original complaint named only the City, Ventenbergs subsequently amended the complaint to add Rabanco and Waste Management as defendants.
[5] Ventenbergs did not raise the impairment of contract issue in his petition for review in this court, and thus we do not address it.
[6] The court also found that there was no valid contract between Ventenbergs and Haider, and thus this claim failed as well.
[7] We stayed the decision to grant review pending the outcome of Amunrud v. Board of Appeals, 158 Wash.2d 208, 143 P.3d 571 (2006), which we decided on September 21, 2006.
[8] The dissent states that there may be a distinction between construction debris and waste, and admits that collection of the latter might be prescribable. Dissent at 974. Should the legislature decide to remove CDL from the definition of solid waste, then perhaps we could find such a distinction. Until then, however, it is clear from the plain language of the statute that the legislature intended that CDL be treated the same as other forms of waste.
[9] The dissent argues that we "mischaracterize[]" the right at issue here because the right is actually "`[t]he right to hold specific private employment free from unreasonable governmental interference. . . .'" Dissent at 976-77 (first alteration in original) (quoting Duranceau v. City of Tacoma, 27 Wash.App. 777, 780, 620 P.2d 533 (1980)). The dissent focuses on the second clause of the sentence and ignores the first: the government may not unreasonably interfere with private employment. For the reasons stated below, the type of employment that Ventenbergs sought was not private. Therefore, it does not implicate the privileges and immunities clause. However, even under our police powers analysis we must determine whether the government acted reasonably. See infra at 12.
[10] Because we find that a general right to employment is not at issue here, we do not discuss Ventenbergs's argument that even though we have held that the right to employment is not fundamental under the Fourteenth Amendment, see Amunrud, 158 Wash.2d at 222, 143 P.3d 571, we should nonetheless find that this right is fundamental for purposes of our privileges and immunities clause.
[11] Because a government must exercise its police powers in a reasonable manner, "exclud[ing] an outspoken political opponent from solid waste collection" or restricting collection "to those of a particular religious affiliation," see Dissent at 979, would clearly be prohibited. Neither political nor religious distinctions are present here.
[12] "Solid waste handling" refers to the "management, storage, collection, transportation, treatment, utilization, processing, and final disposal of solid wastes. . . ." RCW 70.95.030(24).
[13] RCW 35.21.120 contains further evidence of the legislature's intent to distinguish general "solid waste handling" from specific "solid waste handling systems, plants, sites, or other facilities":

Contracts for solid waste handling may provide that a city or town provide for a minimum periodic fee or other method of compensation in consideration of the operational availability of a solid waste handling system, plant, site, or other facility at a specified minimum level, without regard to the ownership of the system, plant, site, or other facility, or the amount of solid waste actually handled during all or any part of the contract period. When a minimum level of solid waste is specified in a contract for solid waste handling, there shall be a specific allocation of financial responsibility in the event the amount of solid waste handled falls below the minimum level provided in the contract.
(Emphasis added.)
[14] The dissent states that our decision today "embraces a devil the framers banished with article I, section 12." Dissent at 981. However, one of the justices in the (unanimous) majority of the Smith decision was Ralph O. Dunbar, a member of the Washington constitutional convention and signatory to the constitution. Wash. Const. Certificate (Aug. 22, 1889); Smith, 55 Wash. at 222, 104 P. 249.
[1] Ordinance 120947 enacted October 7, 2002, codified at Seattle Municipal Code 21.36.012.
[2] Cf. Richard B. Sanders, Battles for the State Constitution: A Dissenter's View, 37 GONZ. L.REV. 1, 5-7 (2001-02) for further discussion of the point.
[3] Ala. Const. art. I, § 22; Ariz. Const. art. II, § 13; Ark. Const. art. II, § 18; Cal. Const. art. I, § 7(b); Colo. Const. art. V, § 25; Conn. Const. art. I, § 1; Ind. Const. art. I, § 23; Iowa Const. art. I, § 6; Ky. Const. Bill of Rights § 3; Mass. Const. Pt. 1 (Declaration of Rights), art. VI; N.C. Const. art. I, § 32; N.D. Const. art. I, § 21; Or. Const. art. I, § 20; S.C. Const. art. I, § 3; S.D. Const. art. VI, § 18; Tex. Const. art. I, § 3; Va. Const. art. I, § 4.
[4] Ill. Const. art. IV, § 13; Ga. Const. art. III, § 6, para. iv(a); Me. Const. art. IV, § 13; Md. Const. art. III, § 33.
[5] E.g., Utah Const. art. I, § 24; Wyo. Const. art. I, § 34
[6] Or. Const. art. I, § 20 states, "Equality of privileges and immunities of citizens. No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."
[7] Ind. Const. art. I, § 23 states, "Privileges equal.  The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."
[8] "`No freeman shall be taken or imprisoned, or be disseized of his freehold or liberties or free customs, or be outlawed or exiled, or any otherwise destroyed. . . .'" Magna Charta, ch. 39, quoted in The Slaughter-House Cases, 83 U.S. (16 Wall) 36, 114-15, 21 L.Ed. 394 (1872) (Bradley, J., dissenting). But see JOHN R. COMMONS, LEGAL FOUNDATIONS OF CAPITALISM 48-51 (Transaction Publ'rs 1995) (1924) (arguing the term "de libertatibus" in the Magna Carta did not mean economic liberty, but political liberty with the prohibition on monopolies beginning with Lord Coke and the common-law).
[9] Other state constitutions expressly excluding corporations from special privileges or immunities are Arizona (Ariz. Const. art. II, § 13); Florida (Fl. Const. art. III, § 11(a)(12)); Colorado (Colo. Const. art. V, § 25); Massachusetts (Const. Declaration of Rights art. VI); and Wisconsin (Wis. Const. art. IV, § 31). Other states expressly proscribe monopolies in their constitutions. See, e.g., La. Const. art. XII, § 12.
[10] The Slaughter-House Cases, 83 U.S. at 74-75.
[11] See La. Const. art. XII, § 12.
[12] The previously drafted constitution of 1878 contained a provision reflecting a similar distrust of corporations and legislated special privileges; it would have invalidated all special privileges not fulfilled in good faith by the time of the constitution's adoption. 2 Wilfred J. Airey, A History of the Constitution and Government of Washington Territory, 403 (1945) (unpublished Ph.D. dissertation, Univ. of Wash.) (on file with Wash. State Law Library).
[13] When interpreting constitutional provisions we first look to the plain language of the text, giving the words of the text their common and ordinary meaning as understood at the time of drafting. Wash. Water Jet Workers Ass'n v. Yarbrough, 151 Wash.2d 470, 477, 90 P.3d 42 (2004). See also Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997) ("Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well.").
[14] "Constitutions. . . . are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 451 (Melville M. Bigelow ed., 5th ed. 1891).
[15] The majority asserts the collection of CDL waste was an unlawful enterprise because it required a certificate from the Washington Utilities and Transportation Commission, which Ventenbergs did not possess. Majority at 964 n. 3, 964 n. 4. However, a certification requirement does not turn a lawful enterprise unlawful since Ventenbergs (or anyone else) could have applied for and received the certificate to haul CDL waste. If the collection of CDL waste were truly unlawful then the City of Seattle would not have had to pass the ordinance in question but merely enforce the law. The fact is the collection of CDL waste was a lawful enterprise, so the City of Seattle modified its ordinance not to ensure consistency with state law, as the majority asserts at 964 n. 4, nor to protect the health, safety, and welfare of its citizens, as intimated by the concurrence, but solely to increase the profits of two privileged companies. The majority expressly recognizes this at 964: "Rabanco contacted the City to alert it to the fact that its profits had been reduced by approximately 40 percent. . . . Rabanco requested that the City . . . enforce the exclusivity provision."
[16] Responding to the majority's claim that its decision does not really "`embrace[] a devil the framers banished'" because Justice Dunbar, a signer of the constitution, also signed Smith, majority at 968 n. 14, I am confident if Justice Dunbar were only with us today he would have written a more articulate dissent than this to denounce pure economic protectionism masquerading as a legitimate exercise of the police power. But more fundamentally, "the authoritative intent is that of the people who had the power to make it law [the ratifiers], not of the people who drafted the Constitution. . . ." Larry Kramer, Panel on Originalism and Pragmatism, in ORIGINALISM: A QUARTER-CENTURY OF DEBATE 151, 153 (Steven G. Calabresi ed.2007).
[17] See infra, pp. 29-31.
[18] Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), overruled in part by Day-Brite Lighting Inc. v. State of Mo., 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (U.S.Mo.1952).
[19] Or "to any citizen. . . ." Const. art. I, § 12.
[20] A full rendition of the text in the petition for review misconstrued by the majority follows:

In the briefing to the Court of Appeals, Petitioners demonstrated that the right at issue here met this test because the First Amended Complaint sought to vindicate Ventenbergs' right "to pursue [his] livelihood[] free from the interference of unreasonable and illegal governmental favoritism." (CP 22.) In Washington, "The right to hold specific private employment and follow a chosen profession free from unreasonable governmental interference is a fundamental right which comes within the liberty and property concepts of the Fifth Amendment." Plumbers & Steamfitters Union Local 598 v. Washington Pub. Power Supply Sys., 44 Wash.App. 906, 915, 724 P.2d 1030 (1986) (underline emphasis added).
[21] That these cases recognize this fundamental right on due process as opposed to privileges and immunities grounds does not negate the thrust of our case law recognizing this fundamental right under article I, section 12. See, e.g., State v. Carey, 4 Wash. 424, 30 P. 729 (1892) (applying art. I, § 12 to the medical profession); In re Habeas Corpus of Camp, 38 Wash. 393, 80 P. 547 (applying art. I, § 12 to fruit and vegetable peddlers); City of Spokane v. Macho, 51 Wash. 322, 98 P. 755 (1909) (applying art. I, § 12 to employment agencies); Dencker, 58 Wash. 501, 108 P. 1086 (applying art. I, § 12 to retail sales); State v. W.W. Robinson Co., 84 Wash. 246, 146 P. 628 (1915) (applying art. I, § 12 to cereal and flour mills). These cases stand for the general proposition that a person has a right under article I, section 12 to pursue a lawful enterprise free from unreasonable governmental interference. (1983) (distinguishing between legitimate state purposes and "providing a benefit to special interests").

Id. at 224.
[22] The majority attempts to reassure by stating any exercise of police powers violating these liberties would fail under its reasonability analysis. Majority at 966 n. 11. However, our individual liberties are inviolate to such analysis, not subject to the prevailing winds of reasonability.
[23] These facts are similar to those in Craigmiles v. Giles, 312 F.3d 220, 221 (6th Cir.2002), where the Sixth Circuit struck down a provision of Tennessee's Funeral Directors and Embalmers Act limiting casket sellers to licensed funeral directors. The court found the provision lacked a rational basis and merely protected licensed funeral directors from competition. The Sixth Circuit explained such protectionism, in and of itself, is per se invalid when the same objectives can still be achieved without the unnecessary regulation:

Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose. See City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) ("Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected."). See also H.P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 537-38, 69 S.Ct. 657, 93 L.Ed. 865 (1949); Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569
[24] In light of the majority's claim that the Supreme Court of the United States has held a municipality without a municipal system of garbage collection may not constitutionally require private companies acting under individual contracts with customers to take collected waste to the city-owned transfer station, I fail to see how this concern makes the ordinance in question constitutionally permissible. See majority at 963.
[25] How creating a monopoly "promot[es] competition," majority at 966-67, is never explained.
[26] WILLIAM SHAKESPEARE, THE FIRST PART OF KING HENRY THE FOURTH act 3, sc. 1.